PELL and others, *appellants,* and TREDWELL, *respondent.*

A family settlement, i. e. a conveyance by a parent of all his real estate to a daughter, for the benefit of herself and her brothers and sisters, made *bona fide,* will not be set aside, in favor of a *creditor* at the time of the conveyance, by whose advice and procurement the settlement was made; the creditor having at the time ample security for the monies due to him by mortgages upon specific portions of the estate, but which, after a lapse of ten years, proved insufficient at a forced sale to satisfy his demands. Nor will the creditor be permitted to raise the *residuum* of his debts by sale of the lands not covered by his mortgages.

APPEAL from chancery. Joshua Pell, junior, the appellant, a man of fortune, is the maternal uncle of Hannah Tredwell, the respondent. From 1804, when he became a widower, without children, until subsequent to 1812, he took a particular interest in the welfare of the family of his brother-in-law, and in the management of its concerns. In 1806, his sister, Mrs. Tredwell, to whom he was greatly attached, died, and when on her death bed he promised her to be a father to her children, of whom she left nine, viz. three sons and six daughters. Tredwell, his brother-in-law, though the owner of a considerable estate, was an improvident man, and frequently in want of money, with which the appellant from time to time supplied him, taking mortgages of portions of his estate to secure the payment of the monies advanced. In 1807, he took one mortgage for $1400; in 1811, another for $2670; and on the 27th May, 1812, a third for $1557. The premises covered by the mortgages were three distinct pieces of land, detached from the *homestead* of Tredwell, though adjoining the same. The homestead consisted of a farm of 119 acres of land, situate within 23 miles of the city of New-York. On the 23d June, 1812, Tredwell executed a deed to his daughter Han-

nah, the respondent in this case, of all his lands in Westchest-
er, conveying as well the premises covered by the mortgages
as the homestead; the deed giving her *one-ninth* as her own
absolutely, and *eight-ninths* in trust for her brothers and sis-
ters, the youngest of whom was then about 6 years of age.
This deed was executed by the advice and with the approba-
tion of the appellant. In 1819, the appellant took to him-
self a wife; and as the respondent states in her bill, his af-
fections and regards were withdrawn from the family of his
deceased sister, and he set about collecting the money due
on his mortgages. In 1821, he filed a bill in chancery to
foreclose the mortgages; having previously, in 1820, com-
menced a suit at law for the recovery of the monies due on
the same, and of a small demand not secured by mortgage.
In January, 1822, he sold the mortgaged premises, and be-
came himself the purchaser for $3300. The respondent and
her father applied for a re-sale, and the appellant offered to
add to the sum bid $2000, so as to make the proceeds of the
sale amount to $5300; which proposition was accepted.
The appellent on the day of the sale of the mortgaged prem-
ises, delivered an execution issued on the judgment obtained
in the suit at law to the sheriff of Westchester, directing him to
levy the 'same on the *homestead* of Tredwell; the amount
which the sheriff was required to make was the *whole amount*
of the judgment recovered. The respondent in April, 1822,
filed her bill in chancery, stating the above circumstances;
alleging that the deed to her was executed by the *advice* and
*procurement* of the appellant; and that she had expended
large sums of money in the maintenance and education
of her brothers and sisters, and in the support of the
family of her father; that the land mortgaged to the appel-
lant at the date of the mortgages, and long after the execu-
tion of the same were ample securities for the monies there-
by secured; that the appellant had for the sum of $500 ob-
tained an assignment of a judgment against her father, ren-
dered in favor of S. Wiggins and H. Booraen, the holders of
a note endorsed by her father for the accommodation of a
third person, for the sum of $2086,22—which note was made
in 1815, subsequent to the date of her deed; and that the

appellant pretended that the conveyance to her was fraudulent, and threatened to enforce both the judgment in his own favor and that assigned to him ; wherefore she prayed that the appellant might be decreed to reduce the sum directed to be levied on his execution to the amount actually due to him ; to release to her the *homestead ;* and to be *enjoined* from selling the same by virtue of the judgments holden by him.

The appellant, in his answer, denied that the deed to the respondent was executed by his advice or procurement, averring that he had no notice of it until long after its execution ; and insisted that it was fraudulent as against him, the grantor being indebted to him at the time of its execution in the several sums specified in the mortgages, and also in the further sum for which he had subsequently obtained a judgment. He however admitted that he did not know that any debts owing by the grantor at the date of the conveyance, besides those due to himself, remained unpaid. Voluminous proofs were taken, and many facts were shewn not deemed necessary here to be stated, as they are adverted to in the opinions delivered in the case. On the filing of the bill an *injunction* was allowed by Chancellor Kent. The cause was brought to a hearing on the pleadings and proofs before his successor, Chancellor Sanford, who dismissed the bill without costs, and subsequently granted a rehearing. Before any further proceeding was had, Chancellor Sanford resigned, and was succeeded by Chancellor Jones, who having been counsel previous to his promotion, referred the case to the judge of the second circuit, and the same was accordingly heard on bill, answer and proofs by the Hon. James Emott, one of the circuit judges, sitting for the chancellor, who *decreed* the deed to the respondent to be a good, bona fide, and valid conveyance, so far as regarded the *homestead ;* directed the appellant to release and quit-claim all right to the same, by virtue of the judgments holden by him ; perpetually enjoined him and all persons claiming under him from proceeding on the said judgments to enforce the collection of the same out of the said homestead, and ordered him to pay the costs of the suit.

Judge Emott delivered the following opinion:

This cause has been sent to me by Chancellor Jones under the statute, in consequence of his formerly having been counsel for one of the parties; and after affording it great consideration, I shall proceed to give my views of the controversy. From some intimations which have reached me, and from the circumstance that I have been attended by the junior counsel only, I am led to the conclusion that the cause, whatever may be the decision here, is to be settled elsewhere. Were I differently situated, such a determination (in the case of a re-hearing,) by the parties in the cause would have ended all discussion as well as investigation as being futile if not mischievous. It is a mere experiment without a legitimate object; and while it adds to the expense in the cause, is a waste of the time of the court. If the cause is to be taken to the court of errors, it could go as well on the present decree, as on any other.

The object of the bill is to clear a farm, held by the complainant under a conveyance from her father, from any charge under judgments held against the latter by the defendant, which judgments are claimed by him as being liens on the property. An execution being out on one of the judgments, the bill on the ground of the facts and circumstances mentioned in it, prayed for an injunction, and was framed with a view to a release from the defendant. The injunction was granted on the bill, but was dissolved on the coming in of the answer. The parties proceeded to take their proofs, and on the hearing, Chancellor Sanford dismissed the bill without costs on either side. He, however, granted a rehearing. It is this rehearing which is now before me, and on which I am to decree. There is no report of the case, and it is understood that the chancellor did not commit his opinion to writing. In the petition for the rehearing however, it is stated that the decree was "founded on a supposed insufficiency of the evidence to prove that the defendant assented to the deed to the complainant, mentioned in the pleadings," whereas it was insisted, and a course of reasoning from the proofs in the cause is gone into, to show,

that the deed was executed with the assent of the defendant, and had in truth been procured by him. As the chancellor has concurred in this statement by granting the rehearing, I feel that my task, though of great labor and difficulty, is of less importance and delicacy than would have been in a review of the legal opinion of that officer.

The bill states that the complainant is the daughter of John and Phebe Tredwell, the latter being the sister of the defendant; that the defendant being unmarried, for a long time during the life of his sister and after, lived in the family and took an interest in its affairs; and that having a large personal estate unemployed, he assisted her father by loans at different times, taking bonds and mortgages on such loans, giving him and the family to understand, however, that he did not mean to urge for payment, but that the children should have the benefit of the money. The mortgages are three in number, and placed on different pieces of land, which pieces of land, it is charged, are very valuable, and at the times of the execution of the mortgages and long after, were ample securities for the debts.

The bill further states, that the defendant, after taking the mortgages, influenced by an anxious regard for the welfare of the children of his sister, apprehending that the real estate of the father might be lost to them unless it was taken out of his hands, procured him to convey to the plaintiff for herself and the other children, all his real estate, comprising the three mortgaged tracts, and a farm of about 119 acres. The deed is dated the 23d day of June, 1812, was acknowledged on the same day, and recorded in the proper office on the sixth day of July thereafter; and it is charged, that the defendant knew of, assented to, procured and urged the executing of the conveyance; and it is also charged that the defendant has frequently since the making of the conveyance, and with a full knowledge of all the circumstances attending the same, recognized and acknowledged the plaintiff as the owner of the property. It is further alleged, that in consequence of the conveyance, the plaintiff, with the knowledge and assent, and by the advice of the defendant, has ex-

pended large sums in the maintenance and education of her brothers and sisters, and in the support of the family.

The bill further states, that the defendant married in June, 1819 ; and that since the marriage, his affection and regard have been withdrawn from his sister's family, and that he has set himself about collecting the monies due on the mortgages, and another small demand he pretends to have against Tredwell, the father.   In the spring of 1820, the defendant commenced a suit in the supreme court on the bonds and on his pretended account ; and in the spring of 1821, he filed his bill of foreclosure on the mortgages : he has proceeded to sale under his decree of foreclosure, and to judgment and execution in the suit at law.   The mortgaged property was purchased in by the defendant much below the amount of the debt ; and he is now attempting to make the residue out of the farm conveyed to the plaintiff, by a sale thereof under his execution.   He is doing this under pretence that the conveyance is void, on account of the indebtedness of Tredwell, and is withal fraudulent.   The bill charges, in substance, that the change of title was immediately made public in the country ; and from the period of the conveyance to the present time, the farm has been under the control and management of the plaintiff, she being at the expense of its cultivation and improvement ; and that she has always acted and been considered and reputed in the neighborhood as the owner.

The bill further states, that long after the deed to the plaintiff had become public and notorious, and about the 16th of October, in the year 1815, Joseph Skinner, jun. to secure a debt due from him, gave a note to one Mason Seely, or some other person, for 1800 dollars, endorsed by Tredwell, which note afterwards passed to Wiggins and Booraem, who prosecuted Tredwell as endorser, and obtained judgment against him for upwards of 2000 dollars, on the 18th of August, 1817.   An execution was taken out on his judgment, and the farm conveyed to the plaintiff was advertised under it ; an injunction bill was filed by the plaintiff to stop such sale, which was answered ; and the defendant, in December, 1820, purchased the judgment for $500 ; and then, without

the knowledge or assent of the plaintiff, procured her bill to be dismissed ; and the bill insists that such purchase was contrary to law, and void, or that the judgment in the hands of the defendant ought not to be valid for an amount beyond his purchase.   The bill also states, that nothing now remains unpaid of the debts which Tredwell owed at the time of the conveyance but the debts claimed by the defendant, and prays that the defendant may release and quit-claim to the plaintiff all the right and interest which he has or pretends to have upon the farm, and may be perpetually enjoined from selling the same to satisfy his judgments.

The answer admits that the defendant took an interest in the welfare of the children of his sister, and felt a sympathy for their situation, as they were nine in number, and all minors except the plaintiff ; and their father, being from his character and habits, incompetent and unfit to attend to their management and education—and that he occasionally lived in the family after the death of the mother, and made loans and advances to the father, and took mortgages in part : but the defendant denies that he at the time considered the property mortgaged as a sufficient security, unless it should be speedily sold ; or, that he gave Tredwell to understand that he did not intend to demand re-payment, or that the monies should be left for the benefit of the children, though he might have used expressions of kindness towards them.   The defendant says, that in 1812, he was called upon to pay for Tredwell about $800, to compromise a suit against him ; and hearing that another suit was depending against him by Mrs. Brevoort, and he and the plaintiff not observing the advice of the defendant on any important occasion, he withdrew himself from the family about six weeks before the date of the conveyance, and informed them that he had lost all friendship for, and confidence in them, and never since has been at their residence more than five or six times, and then only for the purpose of getting payment, or further security for his debts.   The defendant admits that it may be true that the conveyance was made on the 12th of June, 1812, but says that never having seen the deed, and having no knowledge thereof except from hearsay, and the declarations

of the parties, and from having in 1820 procured a copy from the clerk's office, he can neither admit or deny the execution of the conveyance. The defendant also says, that he has no recollection or belief that he ever heard of the execution of the deed, or of the intention of the parties to execute the same until some time after the date of the deed. He has no recollection "that he did at any time approve of the deed;" and he denies "that to his knowledge, recollection or belief, he ever did express any approbation thereof." He avers that he verily believes "the only motive to the making of the deed on the part of Tredwell was to put his estate out of the reach and control of Mrs. Brevoort, in case she should recover judgment against him;" and he denies "that he hath frequently or ever since the execution of the deed, and with a full knowledge of all the circumstances attending the same, recognized and acknowledged the complainant as the *bona fide* proprietor of the said estate."

As to the demand of *Wiggins* and *Booraem*, the defendant says he believes it was contracted upon the credit given to Tredwell on account of his apparent wealth and large and valuable possessions; and in his answer to the amended bill, the defendant says, that according to his recollection and belief, he did not hear the conveyance "openly and publicly spoken of until after the entry of the judgment in favor of Wiggins and Booraem;" and that he does not believe that, prior to such time, it was "generally known in the neighborhood or publicly and openly spoken of;" and he believes "that the credit of Tredwell was in no degree impaired by the conveyance, until after the entry of such judgment;" and that until such time, Tredwell was deemed and reputed to be the owner and proprietor of the lands.

There is much addititional matter to be found in the answer; but I am willing to pass it over as not being very material to the cause, and as it might lead to a course of observation and reflection aside from the merits of the controversy, and wounding to the parties. The analysis I have made shews sufficiently on what points the controversy depends, and fully justifies the chancellor in the conclusion he came to, that the controversy was one of fact. As for in-

stance : If the defendant was amply secured, or secured to his own satisfaction at the time the deed was given, and he advised and assented to the deed, there could be no fraud in fact or in law as to him; and if he is a loser by the deed, it is by his own act; and if he chooses to have it so considered, by his own folly.

To proceed then to the inquiry of the facts: The first thing to be ascertained is, what was due to the defendant on the 23d of June, 1812, when the deed was given; or, that the cause may not appear to be embarrassed by too strict an adherence to days, what was due to him at the date of the deed, or at any time after, during the year 1812, giving time for the deed to have currency, and for the defendant to reflect, and if necessary, to act.

The defendant has shewn an account which he made up with professional aid, and served on Tredwell; and on it I shall base my observations; remarking by the way, that if there could be an accounting in this cause, I should order the books of the defendant to be produced, as well as the securities with their memorandums and endorsements, in order to test the account, inasmuch as he was dealing with an inexperienced female relative, just out of her minority, and a man who he says was not fitted by his character or habits to attend to business. This account charges the three mortgages, one of the 10th of August, 1807, for $1400; one of the 8th of May, 1811, for $2670; and one of the 27th of May, 1812, for $1557; in all, for principal, $5627,67. The account gives credit on the 10th of May, 1811, for $367,50 interest on the first bond, and which, if it does not quite amount to the sum then due, was most probably intended to settle the interest to the time of the second bond. Whether this interest was discharged by an actual payment at the time, or was included in the second bond, does not appear; though I think the latter is fairly to be presumed, as it would be strange that Tredwell should pay the defendant nearly $400, while he was making a loan to him of nearly $2600. I know the bond is dated the 8th and the credit the 10th of May; but this is one reason why I should like to see the original entries. If interest is then to be calculated on the two first

bonds, it would be but for about a year, say $280, which, added to the principal of all the mortgages, would make less than $6000, to the, greatest extent, as the indebtedness of Tredwell to the defendant on the mortgages at the time of the deed. It would also, if material, be worthy of inquiry, whether the interest for the year on the two first mortgages was not included in the last mortgage; and this is another reason why it would be necessary to see the original entries and the securities. The defendant professes to have been anxious at all times to have his interest; and if he was so, he would be apt, when he took the last security, to take care if his interest was not paid, to turn it into principal.

The defendant by his answer appears anxious, in order to fortify his case, to make out, that besides the mortgage debts, he had at the time of the deed a demand against Tredwell for money advanced for him to an amount rising of $500. The first item in this demand is for $215,37½, paid to Bishop Underhill on the 15th of May, 1812; and another charge is for $306,37½, paid to John Towt, for Briggs, on the 2d of June in the same year. The other items are in themselves trifling, not exceeding in all $30. Now the first thing that appears strange in this statement is, that the advance to Underhill on the 15th of May should not have been included in the mortgage of the 27th of May, made avowedly to cover and secure advances. The account, if true, however, may explain this, and to my mind, puts these claims at rest forever. A credit is given on the 30th of May, 1812, for $500, paid by the plaintiff; and as it is not put down as interest, and was so soon after the last mortgage, there can be no reasonable doubt that this sum was intended and received to enable the defendant to pay all the Underhill and Briggs demands. I am therefore satisfied that at the date of the deed the defendant had no demand, or at least one of very trifling amount against Tredwell, except the mortgage debts.

The next inquiry is, whether the defendant at the date of the deed was amply secured, or secured to his satisfaction. We have but five witnesses, who, according to my recollection, speak as to the value of the mortgaged lands in 1812; but they are all persons who lived near and knew them well

and their value, as lands were then selling. Bishop Underhill, who has lived within less than a quarter of a mile of the property for 25 years, values the three lots at $9450. John Bonnett, who lives about a half a mile from the place, values them at $9630. Gilbert Underhill, who has resided within a mile and a half from the property about 16 years, values them at $11250. Daniel Burpo, who for his whole life has lived within a mile and a half of the lots, values them at $9700. If these witnesses are to be believed, and they stand very much uncontradicted, and with the exception of Tredwell, unconnected with the parties, then we have a property which may be fairly put down as worth $9500 in the year 1812, as security for a debt of less than $6000. I hold this an ample security, and so did the defendant at the time, as he by his answer admits the security was sufficient, if the lands had been speedily sold; or, to use his own words, "He denies that he at the time considered the property mortgaged a sufficient security, unless it should be speedily sold." That he was satisfied with his securities at the time is quite apparent from the answer, in which he says, "that the three parcels of land mortgaged were in his opinion, and in which opinion Tredwell professed to concur, those pieces which could be most conveniently spared or severed from the farm, leaving to Tredwell an ample sufficiency for the respectable support and maintenance of himself and his family." It is quite evident, from this declaration, as well as from the acknowledged control he at one time had over Tredwell, and his means of coercion, that the selection of the lots and security were made by the defendant himself. If by the depreciation of property and the accumulation of interest the security has finally proved inadequate, the defendant has himself to blame, as he might have realized his demands by an early foreclosure and sale. It would be dealing equity rather harshly to permit the defendant, at this late period, on the footing of his mortgage debts only, to overturn a family settlement made in 1812, which could then have no view to him, and particularly if it should appear that this settlement was made from fair motives, and to answer desirable ends. If there was nothing in the case therefore but the

mortgage debts, secured as they were at the time, and the settlement made without actual fraud, the plaintiff would seem to have established her right to the interference of this court to dispel this cloud on her title. But we will proceed to the examination of the next point in the cause, whether the deed to the plaintiff was given with the knowledge and advice or assent of the defendant.

This appeared to the chancellor to be the turning point in the cause; and according to the petition for the re-hearing, he dismissed the bill, because he thought the testimony in the cause did not make out the fact. It becomes me, therefore, to approach this part of the case with great caution; and, bound as I am to pursue the investigation, I do it with much distrust of myself, and with the utmost respect to the opinion of the late chancellor.

Before I enter into the examination of the testimony which it is said establishes the privity and assent of the defendant to the conveyance, there is one circumstance which appears to me so important in forming a conclusion one way or the other, that I think it worthy of a separate consideration; and that is, whether the intimacy of the defendant with Tredwell and his family continued up to the period of the deed. The nature of this intimacy will be noticed hereafter. The bill not only strongly implies this, but charges that the defendant did not withdraw his affection and regard from the family until after his marriage with his present wife, in the year 1819. The defendant, it will be recollected, says that he quit this family some weeks before the conveyance, having informed Tredwell and the plaintiff that he had lost all confidence in them; and from that time the defendant alleges all intimate and friendly intercourse between him and the family ceased. The fact of his withdrawing from the family may be true; but it is hoped, for the sake of the defendant himself, that he has forgotten the grounds of the separation. He appears naturally kind-hearted, though somewhat spoiled by the attention of his relatives in consequence of his reputation for large property while he had no child to inherit it. The mother of this family had been his favorite sister, and it was with her and under her roof that he resided when she

suddenly and unexpectedly expired, a few weeks after giving birth to a child. At the very moment of her dissolution, she placed her children, young and helpless as they were, under his charge, to watch over and protect them with a parent's care. The defendant took upon himself the solemn and responsible duty, and closed his sister's eyes in peace and thankfulness. It was over her lifeless body he poured out his soul to his Maker, begging that he might have the disposition, as he had the power, to cherish and direct the orphans so committed to him. The defendant knew the character of the father, and that it was owing to his conduct that the mother was desirous of leaving to him the bringing up of her off-spring; and yet, in six years after her death, the defendant is willing to represent himself as having deserted this helpless family, because the father was living in a course of profligacy, which was bringing ruin on himself and disgrace on his connexions—the reason, among all others, which ought to have pointed to a different course. How much better will the defendant appear, if, after several years of estrangement from, and severe litigation with this family, it shall prove that he has forgotten the exact time of the separation, as well as the very cause, and that in truth he did not leave the children until the debts of the father were liquidated, and what remained of his property was secured to them? Then, indeed, it would appear that he had been mindful of his promise to his sister, and his vow to his God.

As the intimacy did once exist, and according to the admission of the defendant himself, continued until within a few weeks before the deed, the fair presumption probably is, that it did not end until after the giving of the deed; at all events, it was a fair subject for proof, and we have proof from both parties. To begin then with that on the part of the defendant: His first witness is Henrietta Hoffman, a grand-daughter of Tredwell, who has lived with and been brought up in the family from her fifth year, and who, when examined in 1823, was thirteen years old. This girl, in fairness to herself, considering her age, and the situation in which she was placed in the family, was rather unnecessarily introdu-

ced in the cause. At the period of the deed she was not in the family, and was, withal, a mere infant of a little more than a year old. It is doubtful, too, whether she has been treated exactly as she ought to have been to give weight to her testimony. According to her statement, when she came to New-York she used to tell the defendant and his wife what she had heard her grandfather, and the complainant, and the family say, respecting the matter between them. But as to this point, her testimony, if it has any bearing, is rather against the defendant. She says, " she does not recollect of any intimacy, but she has understood and believes, that the intimacy was broken off six or seven years ago ;" and this fixes it in 1816, some years after the deed. The mother of this girl, Abigail Hoffman, a daughter of Tredwell, says, that about sixteen or eighteen years ago, and which, we may observe, was before her mother's death, a friendly intimacy existed between the defendant and his family, when he was in the habit of making half a dozen visits a year, sometimes staying some weeks. About eleven or twelve years ago (in 1811 or 1812, calculating from the time of the examination) the defendant began to disapprove of the conduct of the family ; and to the best of her recollection, as to the time the friendly intercourse began to be broken off, it was in 1809 or 1810. This witness does not say when the intimacy altogether ceased, and it is quite certain that it was not as early as 1810, as the defendant himself admits it to have continued until the spring of 1812, and within a few weeks of the deed. She, however, explains in what the intimacy consisted, and so far her testimony is material, as going to explain the testimony of some of the other witnesses. She says, " that about seventeen or eighteen years ago, a friendly intercourse existed between the defendant and her father and family ; that at such period of time the defendant was in the *habit of visiting as aforesaid, as much as half a dozen times a year*, and he used, on such occasions, to stay as much as three or four weeks at a time ; the distance between the residence of the defendant and of her father, was about twenty-two miles." It appears from this, as well as other testimony in the cause, that the intimacy consisted in

occasional visits to, and not in a continued residence in the family. The defendant had his place of abode distinct and at a distance from that of the Tredwells.

Catharine Hammel, who resided in New-York, testified that the defendant came to board with her in 1811, and continued with her upwards of a year. She had no recollection of his visiting Tredwell more than once, which was in the season of fruit. John Tredwell occasionally called upon him, and they appeared to be on friendly terms. William Hammel, the son, testified that the defendant commenced boarding with the mother in the spring of 1811, and continued with her for about a year and a half. He recollects that the defendant went two or three times to visit Tredwell, and once, as he thinks, in the spring of 1812, for the purpose of trimming trees: Tredwell called upon the defendant several times, and they appeared on intimate terms. This testimony, after the admission by the defendant that his friendly connexion with the family did not cease until late in the spring of 1812, and after the testimony of Mrs. Hoffman, that the intimacy was shown by visits and not residence, can avail nothing. If it proves any thing, it goes to show that the intimacy with the family continued during the residence of the defendant with Mrs. Hammel. The defendant received Tredwell as a friend, and he went to the farm, not for hostile purposes, but to aid the family. The number of visits which the defendant made is not very material, and if it was, it could hardly be established by the vague recollection of these witnesses, after a lapse of more than twelve years, when they had neither cause or object to mark or bear in mind the fact.

After all, if the fact " that the defendant, about six weeks before the date of the deed, withdrew himself from the family, informing them that he had lost all friendship for, and confidence in them," (and this is his allegation,) it must be made out by the testimony of Mary M'Clelan, in whose family he lived from 1812, and whose daughter he married in 1819, and of William M'Clelan, the brother-in-law and solicitor of the defendant. The testimony of both these witnesses is swelled beyond all proportion; much is put down

which cannot be received in the cause—as the declarations of the defendant in the absence of the plaintiff, and the declarations of third persons—and much appears which can have no weight in the cause, as the opinions of Mrs. M'Clelan, residing in New-York, and never having seen the property but once, on a ride past it, as to the reputation of the country respecting the ownership.

In truth, the testimony of Mrs. M'Clelan, when sifted down, amounts to but little. She says that she has been acquainted with the defendant since 1812, having since lived in the same house with him. The first time she recollects his going to Tredwell's was with his nephew in 1812; the next time he went was with a Mr. Ludlow, about some merino sheep; and in 1816 or 1817 he again went, as he said, to demand interest. She declares, that from 1812 to 1819, she was in the habit of seeing the defendant every day, except when he went to Long Island and New-Jersey, and she has no reason to believe that the defendant went to Tredwell's other than the times she mentioned. That Mrs. M'Clelan is mistaken about the number of times the defendant visited the Tredwells, (be the cause of the visits what it may,) appears from the answer in which a greater number is mentioned, and the testimony of the son who speaks of six visits. But as the witness had no inducement, in the early part of her acquaintance with the defendant, to watch over him and to note the times and the occasions of his visits to this once favorite, and until his marriage, expectant family, much reliance cannot be placed on what she says or means to say, about the intimacy of the parties in the spring and summer of 1812. After the defendant had commenced sleeping in the same bed with the son, which Mrs. M'Clelan says was in the fall of 1812, it is certain that his friendship for the family began to cool, and it is equally certain that in a few years afterwards he became hostile to the Tredwells; but all this does not prove that the intimacy had ceased before the period of the deed. The witness, however, relates a circumstance which seems at variance with the declaration of the defendant, that he, before the giving of the deed, had quit the family, declaring to them that his friendship and confidence were

gone. In 1813 or 1814, the witness says one of the daughters was married at the farm, and the defendant told her he had not been invited to the wedding; he appeared offended and hurt, and declared that he had not expected to have been so treated. Now, if in truth, the defendant had, in April, 1812, separated himself from the family in the manner he has described, he would have had no cause to be either offended or hurt, because he was not asked as a guest.

With respect to the testimony of William M'Clelan, I would willingly pass it over in silence, if it had not been pressed upon me by the witness himself, who has acted in all capacities in this unfortunate controversy. There are occasions when gentlemen of the profession must testify for their clients; but they always do it at the hazard of being discredited. The necessity should be urgent and apparent. If full weight is claimed for the testimony, it must not appear that the witness has been nurturing the controversy, and getting from time to time admissions to answer particular purposes. A plain man in the country would be in continual danger from an attorney who was thus watching over him to testify. And it is the bounden duty of a court, whenever the case occurs, to mark the attempt with its disapprobation.

The witness gives us to understand, that in 1816, '17, and '18 he was a master of this court, and that he was solicited by the defendant to give up his commission, to do his business in chancery, which he declined until he was appointed commissioner under the act of 1818. And this he says is the reason why the defendant delayed proceeding on his mortgage. If such was the reason for the delay, it was one of no great force, and one which will certainly not excuse laches on his part: but it does seem strange, that in such a place as the city of New-York, where the defendant might have found relatives in the profession, who were capable of conducting a mortgage to a foreclosure; and where resided professional men of high standing, and fair fame, he should pin himself so absolutely to the witness, then a young man, whose professional merits had not created for him a standing at the bar, and who had been known to the defendant but for a few years. I will not attempt to draw any inferences

from this strange statement; but I cannot forget that it has been made the foundation for insinuations unfavorable to both party and witness. From the time the defendant went to board with Mrs. M'Clelan, and began to sleep with her son, he seems to have acted solely as directed by the latter. When the defendant went to Tredwell, it was in company with the witness—so says the latter in his answer to the sixth direct interrogatory, drawn by himself for himself. "And the deponent further saith, that whenever the defendant went to see Tredwell, at his residence, to the knowledge of the deponent, he *the deponent accompanied him.*" When the account was to be made out, it was done by the witness, and presented by him, and the conversation carried on by him, although the defendant was present. So says the witness in his answer to the seventh interrogatory. "And the deponent further saith, that in the year 1820 he made an account current, and by the direction of the defendant, presented the same to Tredwell, in the defendant's presence, and asked him whether it was right." He thinks too he was provided with a warrant to confess judgment, which he left with Tredwell. When the sheriff's sale was to take place, the witness again attended, taking with him Daniel Townsend, who has been made a witness in the cause, testifying against all belief, to an hour's conversation with the plaintiff, a female, and a stranger to him, held at the bar-room fire, in which she is made to say, without any question by the witness leading to the declaration, "that she had a deed of the farm made to her by her father, *but not legally.*" There are other circumstances in the cause, going to show that the witness has been most actively engaged from the commencement of this sore dispute, in preparing it for a contest at law, and he must therefore expect when he testifies to facts or admissions which are not in some degree at least supported by other witnesses, that his testimony will be received with great caution, and some hesitation.

As to the intimacy, the witness says, that since his acquaintance with the defendant, there has been very little friendly intercourse between the defendant and the Tredwells; and that since the year 1812, he does not believe that the de-

fendant has been at the residence of the family more than six times in all.    He also says, that he has understood from the defendant and others, that previous to the year 1812, the defendant had been intimate in the family, spending part of the summer in it ; but that in consequence of the improper conduct of Tredwell with two females, the last instance occurring in May, 1812, the defendant " broke off his usual familiar intercourse with the family." This is certainly faint language, if the witness meant to testify to the kind of separation set up by the defendant.    The witness, from his daily intercourse with the defendant, must at the time have known the fact, if fact it was, that the latter had quit the family having lost all confidence in, and friendship for it.    There are one or two circumstances related by the witness, which go to show that the defendant had forgot the period of his final breach with the Tredwells, and they will explain why the witness has spoken so cautiously.    On the 27th of May, less than four weeks before the date of the deed, the witness says that the defendant made a loan to Tredwell of rising of $1500, taking a bond and mortgage drawn by witness.    On the 2d of June, the witness saw the defendant pay for Tredwell rising of $400, to satisfy a debt held by one Briggs, for which the witness says no security was taken.    About the same time, according to the account and testimony of this witness, Tredwell gave to the defendant a general power of attorney to act for him.    All these acts are utterly at variance with the allegation that the intimacy and friendship between the Tredwells and the defendant had ceased six weeks before the deed.    On the contrary, they go strongly to prove that whatever might have been his feelings for the father, the defendant continued his protecting care over the children until a period nearly approaching the date of the deed.    Upon the whole, if I find nothing in the testimony produced by the defendant, absolutely to contradict his allegation relative to his casting off this family as to time, yet I find little in it which goes to fortify his statement.    But still it must stand, unless it is fairly met, and contradicted by the testimony for the plaintiff.    And to this I shall now apply myself.

John Tredwell says, that both before and after the deed the defendant was upon intimate and friendly terms with the family ; and that it was long after the conveyance that the defendant withdrew from the family and discontinued his intimacy therein.   John Bonnet says, that he lived in the family at the time the deed was given, and he thinks that the defendant was then intimate in the family ; and that it was the common talk at the time, that the defendant had advised the giving of the deed.   Bishop Underhill says, that at the period of the deed he was particularly intimate in the family, and with the defendant.   About the time of the conveyance, the defendant appeared on intimate and friendly terms with the family, taking an active part in the management and superintendence of the family and farm ; and Tredwell appeared to be under his friendly influence.   The defendant was frequently at Tredwell's after the time of the conveyance, and appeared friendly for as much as from three to six months after the conveyance, but afterwards the intimacy appeared to die away.   He says he cannot testify how often in the spring of 1812 the defendant was up ; but that during the forepart of the summer of that year, the defendant was at Tredwell's a considerable part of the time.   Gilbert Underhill says, that in or about 1812, the defendant was intimate in the family, and was so when the witness first heard of the conveyance.   The witness was at Tredwell's frequently, and he thinks he saw Pell after the deed.   Gabriel Lawrence says, that about the year 1812, the defendant appeared to be intimate in the family, correcting the children, and directing the labor on the farm.   Witness understood that the deed had been given to secure the property for the family, and he thinks the defendant told him so.   He says, that the deed was publicly talked of in the neighborhood, and soon after the talk first began, the defendant, speaking about the conveyance, told him he need not be uneasy about his money, for Hannah would settle it.   Patrick F. Tighe says, that in June, 1812, and during that year, the defendant was intimate in the family.   The witness was frequently at the house, and had a good opportunity of hearing when the defendant was there, and observing his influence in the family.   He has frequently seen

the defendant there, before and after the deed was spoken of; and it was the general opinion that he procured the deed to be made. Nancy Tighe says, that when she first heard of the deed, the defendant appeared friendly in the family, and the report was that he had caused the deed to be given, and she saw the defendant at different times, at Tredwell's, after she had heard of the deed. She says it was after the report of the deed, that she saw the defendant at Tredwell's, and so intimate there. Dixon Tighe says, that about the time of the date of the deed, the defendant was intimate with the family; and it appeared to him, from the conduct of the defendant, that he was master on the place, and the common talk was that he led Tredwell by the nose. Sarah Pell says, that before and at the time the deed was read at her house in June, 1812, and she thinks after, the defendant was frequently at her house in company with Tredwell, and some of his children who were there, and it appeared to her they were on intimate and friendly terms. About the time of the reading of the deed, Tredwell and the defendant were at different times alone together in the room occupied by Tredwell. As to the causes which the defendant and the witness, M'-Clelan, say led to the abandonment of so close a connexion—the conduct of Tredwell towards the two females, Miss De-voe, and Mrs. Brevoort, the witness Gabriel Lawrence, says, that he lived in Tredwell's family after 1810, being then about twenty-one years old ; and while he was there, the defendant asked him if for a couple of hundred dollars he would say that a child which Polly Devoe had charged or was about to charge on Tredwell was his; and the witness understood the defendant meant by the offer to save the family from being disgraced. And Martin S. Wilkins, a witness for the defendant, says that the suit of Mrs. Brevoort was commenced in October, 1812 ; and that Tredwell and the defendant used frequently to be at his office together, both before and at the time of the suit, he being employed to defend the same ; that the defendant and Tredwell appeared to be on friendly terms, though the former seemed to be displeased at the conduct of the latter, relative to the woman who had brought the suit. There is other testimony which will be

ALBANY,
Dec. 1830.

Pell
v.
Tredwell.

found to bear strongly on this part of the cause ; but I think enough has been adverted to, to show very conclusively that the defendant is mistaken in saying that his intimacy with the family had ceased before the giving of the deed ; and that he withdrew himself from it on account of the conduct of the father towards the two women.

I have been thus particular on this point, because it appeared to me, as it did to the parties, that it was a strong one in the cause. If, in truth, the defendant had, as he represented, six weeks before the giving of the deed, separated himself from the family openly and avowedly, because his confidence and his friendship were gone, using towards them terms of reproach, it could not be expected that they would have consulted him about the deed, or that he would have advised it. The presumption would have been against all this, and therefore strong proof would be required to establish the fact of his interference. But on the other hand, if the intimacy, such as is admitted by the defendant, and is testified to by the witnesses, an intimacy which almost placed the defendant at the head of the family, giving him the care of the children, and the charge of the property, continued until after the conveyance, then the presumption is strong that the conveyance was not only known and assented to by the defendant, but as the neighborhood believed and asserted, that it was procured by him. As was remarked on the argument, the death-bed legacy of the mother had given the children to the defendant ; and he, with tears and prayers, had taken upon himself their guardianship. The father was leading a life of extravagance and excess, and in five years he had encumbered his property to the defendant to nearly $6000 for monies loaned ; and unless he could be stopped in his career, it was quite certain that the children would soon be without the means of support. The defendant had then a strong inducement to arrest his progress to ruin ; and, placed as he was, it was his duty to throw himself across the path of this inconsiderate man. To talk to him of reformation was useless, and there was but one way of saving the family, and that was to induce the father to give his property to his children. It was not an easy task to procure a conveyance from a man in the

prime of life, which would render him a dependant on his children, and accountable to them for his conduct for the rest of his days; yet this was done in this case. It required the persuasion and the influence of a man who had made himself felt as a superior, and who had power to coerce by enforcing heavy debts, and who could hold out prospects of great advantage to the party. Such a man was the defendant. He had, for years, been in the family as its guardian and protector, and the father had surrendered to him his authority, and went by his directions. The debts he held were beyond the ability of the father to adjust; and the father and the family, with or without reason, looked to him for an advancement out of what they deemed a large estate. With these motives, and clothed with such power to procure the conveyance, we will now proceed to examine whether the defendant was privy to it.

Abigail Hoffman, the witness for the defendant, testified much about the drawing of the deed, and about the conversations and matters which led to it. She says, that "when the draft deed was read over" the defendant was present, and "she remembers that he walked the room and appeared displeased at something, but whether it was at the conduct of Tredwell or the making of the deed, she does not know. She thinks they wanted him to stay and hear the deed read, but that he went away, and appeared to be angry." She adds, that she does not recollect hearing the defendant express any approbation or disapprobation of the deed; he went out of the room before it was read, and being asked if he would stay and hear it read, he answered that he would not stay, or he did not care. This witness, in a writing signed by her on the 10th of October, 1822, about a year before the examination, gave a different account of her recollection. In that, she says, "the deed was read in the presence and hearing of the defendant, who sat down part of the time it was reading, and part of the time he walked the room;" and that he made no objection to the conveyance in her hearing. It must be left to the witness to attempt to reconcile these statements; but take either, and it establishes the fact that the conveyance, so far from being concealed from the de-

fendant, was shown to him in a consultation of the connexions of the family in its very draft. Sarah Pell, another witness, who was introduced by the plaintiff, says that in May or June, 1812, the deed was read at her house in New-York by the attorney who drew it, in the presence of Tredwell, his children, the plaintiff, and Mrs. Hoffman, the witness and her husband, who is now dead, and the defendant. The defendant sat next to the person who read the deed, so that he must have heard it; that during the reading of the deed she sat very near, and facing the defendant, and she does not believe he left the room until the reading was over. In the course of her examination, she also testified that after the reading of the deed the defendant one day spoke to her about it, but she does not recollect what he said in particular on the subject. These two witnesses, and one of them introduced by, and a favorite of, the defendant, establish beyond all doubt, that he was apprised of the deed, and its object, before its execution; and that he was one of the friends of the family called upon to settle its details. What then becomes of that part of the answer in which the defendant is made to say that he has no recollection or belief that he ever heard of the execution of the deed, or of the intention of the parties to execute the same, until some time after the date of the deed. It may be said that this is not a positive denial of the fact. Be it so. It at least shews such a want of recollection of a most material circumstance, and which could hardly be thrust from the memory as to leave but little to be depended on for the answer in general. And perhaps the case for the plaintiff might here rest, as in shewing the knowlledge of the defendant without any mark or pretence of disapprobation, his assent to the deed is fairly to be presumed. But much yet remains to be said, though it shall be shortly said, to shew the assent of the defendant to the deed as well as his knowledge of it.

John Tredwell says, that before the deed was executed, he and the defendant frequently talked over the subject of the deed, and the defendant advised the giving of it for the benefit of the children; he says the defendant advised him to go to New-York to give the deed; and directed him to Joseph

Pell; and this testimony is in some degree confirmed by that of Sarah Pell, when she says that about the time of the reading of the deed, Tredwell and the defendant were at different times alone together in the room, in her house occupied by the former. Tredwell also says, that before the deed was executed, the defendant was sent for to the house of his brother Joseph, to see if he approved of it, and the witness saw him have the deed in his hands open, and appearing to read the same. This witness further testifies that the defendant after the deed said to him, Now you have made a conveyance to Hannah, you must settle with those you owe and pay them off; for the future, all charges must be made to Hannah. He also said, you have an account with Bishop Underhill, and I will go with you and see it settled. They went accordingly, and settled with Underhill; and a small sum remaining due, it was by the direction of the defendant, charged to the plaintiff, he saying to Underhill that the witness had conveyed all his landed property to the plaintiff for the benefit of the children. This relation is confirmed by Underhill, who says that in June, 1812, "the defendant directed him to change" the account from Tredwell to the plaintiff; and from what the defendant told him at the time, the witness understood that Tredwell had conveyed his land to the plaintiff. The day book of Underhill is now before me, and the last charge in it to John Tredwell, is of the 24th of June, 1812, and the first to Hannah Tredwell, the plaintiff, is of the 26th of June. The deed, it will be recollected, was given in New-York, on the 23d of June. This testimony is positive and strong, but there remains one or two circumstances to be noticed which I think leave nothing for doubt. If the person who projected the deed, had taken professional advice on the subject, he would have been told that to make it valid the existing debts of Tredwell must be paid, and that the plaintiff must appear as the open and avowed owner of the property. We accordingly find the persons interested thus acting: Tredwell testifies that a short time before the deed he sold a piece of land to Odell and another to Dennis. The defendant had a power to have the surveys made, to receive the purchase money and to settle debts,

and he accordingly did receive the money, and paid debts with it. The witness says, the object of the sales was to pay debts; as the defendant told him all the debts must be paid before the conveyance could be good. He also testifies that the defendant told the plaintiff to be very particular to have nothing charged to the witness, but said he might buy and sell, and act in the business of the family. Ann Odell, the widow of one of the purchasers, says she resided at Tredwell's when her husband took the deed. The defendant was busy in preparing the writings, and procured a carriage for the witness and her husband to go before an officer to execute a mortgage. She says the defendant aided in making a survey. Dennis, the other purchaser, says that his deed is dated 11th May, 1812; he gave for the land $1075 at the time of the conveyance to him, and the defendant was present. Bishop Underhill counted the money. Bishop Underhill testified that the sales to Dennis and Odell were in May, 1812, and that the defendant received the money on the Dennis purchase, and over $1000. The Odell purchase was about $800. It appeared to the witness that the defendant was endeavoring to clear Tredwell from his embarrassments, and to save the residue of the property for the children. On the 15th of May, 1812, the defendant settled with the witness, and paid him Tredwell's account of upwards of $200. The account of the defendant against Tredwell, which is an exhibit in the cause, shews $215,37, paid Underhill on the fifteenth of May, and $300 paid Towt on the second of June. This testimony is entirely consistent, and establishes the fact that very shortly before the deed the defendant was actively and most efficiently engaged in settling the debts of Tredwell; and as it appeared to me, as a necessary preperations for the deed. In no other way can his conduct be accounted for.

There is another strong circumstance in the case. The farm which is the subject of the present controversy, containing about 118 acres, is described in the deed with great particularity by courses and distances, and in it the names of the adjoining occupants are given. Among the exhibits is a paper headed "John Tredwell, June 8th, 1812," which pur-

ports to be the rough and original field minutes of a survey, and which corresponds with the description in the deed. There is also an exhibit, in the form of a map of this farm with two other lots, marked, "The property of John Tredwell, lying in the town of Eastchester, June 9, 1812, Barak Prior;" and there is a further exhibit, purporting to be a letter, dated White Plains, 11th June, 1812, signed Barak Prior, and directed to Joshua Pell, in which it is said, "the enclosed contains the draft and quantity of the land in question," and the writer intimates his hopes that he may agree with "your calculation obtained in the city;" and it is added, "I must now comply with your request, and present you with the task assigned me." Barak Prior was examined as a witness for the complainant, and testified that he was 73 years old, and had practised surveying for 40 years. He said that he made a survey of part of the Tredwell farm on 8th and 9th of June, 1812, that the field book contains the minutes of the survey as taken at the time, that the map is the one made by the witness at the time from his minutes; and according to his recollection, this map was enclosed in the letter to the defendant. The witness says that Tredwell was not present at the survey, but that the defendant went with him around the whole of the land; and that he was the only person present who gave any directions to witness, and superintended the survey; he never made any copy of the field book but the one he delivered to the defendant on the day the survey was completed, and before the map was made. The defendant requested a copy of the field book, but did not state for what purpose, although he recollects that the defendant at the time told him he was shortly going to New-York; and it is a remarkable fact, that in the account of the defendant against Tredwell, he has a charge of $4 for surveying, on the 9th of June, 1812, exactly corresponding in time with the survey of Prior. That this survey was made in contemplation of the deed and preparatory to it there can be no doubt. That the bounds were copied from the field minutes furnished the defendant at his request, and that he directed, and superintended, and paid for the survey, there is as little doubt.

We have then the facts, that the defendant remained the friend and intimate of the family until after the giving of the deed; that he made arrangements preparatory to it, by settling the debts of Tredwell, and having the survey made; and that he knew the deed had been drafted, and attended at its reading; and from thence the inference is so strong, that he not merely assented to the deed, but that he advised and procured it, that I could not escape from it if I felt so inclined. This, then, decides the cause as to the main point; (the proper debts of the defendant;) for it cannot be tolerated that he shall set up his own acts as fraudulent, to benefit himself.

But I am at a loss to discover in what the fraud consists. In my judgment, if there ever was a case in which a conveyance from a parent to a child was meritorious and demanded, this is one. The parent here was licentious in his habits, and so inattentive to his business, that with a large landed estate, not materially encumbered, he in a few years created a very heavy debt, and was in a fair way of consuming all his property, by which his large family of children, some of them almost in a state of infancy, and the most of them females, would have been cast upon the world in a state of destitution and poverty. It seems almost an act of special providence, that this man should have been arrested in his career by the influence of the defendant, if such influence was exerted, or the fear of a claim and suit by Mrs. Brevoort. The conveyance was made without concealment, and the daughter forthwith assumed the control of the property. The consequences have been most salutary to the parent and merciful to the children. The debts of the former have been, as one of the witnesses expresses himself, honorably paid; and his means, with his reputation for property, having been diminished, his power of doing mischief has been curtailed, if not destroyed. The children have been nurtured, and protected, and educated, and, by reason of this most provident of all conveyances, have maintained their station in society.

Who can call such a conveyance fraudulent, or wish it to be set aside? The only person who had any reason to com-

plain of the deed does not complain of it. Of Mrs. Brevoort it is my wish to say as little as possible ; she is now respectably, and I hope happily married ; and if her name has been used in these proceedings, it must have been without her consent, if with her knowledge. Thus much, however, it is necessary to say : If she suffered by her intercourse with Tredwell, she was not entirely without fault. Her former marriage and her age had armed her with experience; and she had too the case of Miss Devoe as a standing beacon and warning. If, with all this, she yielded to the importunities of the father of a large family, she had in some measure to blame herself. But of this claim we after all know but little. It is at best but one of rumour ; and although a suit was commenced, it was abandoned. The only real injury in truth in the case is thus spreading the tale before the public eye, at this late period, when the female is reposing in the bosom of her family, thus giving new currency to the report, and opening afresh wounds that have been healed over for years.

I have said that the deed was made without concealment, and that the plaintiff forthwith assumed the control of the farm. It is proper that I should shortly notice the evidence to the facts, before I proceed to the next point. The first thing to be noted is the recording of the deed on the 6th of July, 1812, in the office of the clerk of Westchester, thus giving it publicity immediately after its date, and in a way not then required by law. The witness, Mrs. Hoffman, says, that since 1812 the plaintiff has had the management of the farm in her own hands. John Bonnet says, that since the conveyance, Tredwell has been reputed as worth nothing. It was the common report that the defendant had advised the giving of the deed about the time Underhill was directed to change his account. Hugh S. Underhill says, that upwards of 12 years ago he heard of the deed, and the plaintiff has for several years had the superintendence of the farm. Gilbert Underhill says, he heard of the deed from rumour, in 1813 or 1814, and it was then believed that it had been given with the knowledge and advice of the defendant. Since he first heard of the conveyance, it has been generally understood

that the plaintiff owned the farm ; and the business of the farm has been principally conducted by her. Patrick Tighe says, that after the deed was given, it became a matter of general notoriety : the plaintiff has, since June, 1812, been the reputed owner of the farm, and had the management of it ; her credit rose, and that of Tredwell fell in consequence of the deed ; and the family have since been supported by the plaintiff. John Tredwell says, that the plaintiff has universally been considered as the owner of the land ; the assessments were made in her name, and her credit was materially increased by the conveyance. Since the deed, the plaintiff has had the superintendence, direction and control of the farm, and the business has been conducted in her name. She has expended large sums in making improvements and the bringing up of the family. John Townsend said he was the sheriff of Westchester, and had for many years been the supervisor of Eastchester. For ten years and upwards the plaintiff had been assessed for the farm. Tredwell had not been assessed either for the real or the personal estate, nor has he voted at elections. For several years it has been matter of common report, that Tredwell had conveyed to the plaintiff ; and since the conveyance, his credit has not been good. Bishop Underhill says, that in the summer of 1812, and ever since, the plaintiff was generally reputed to own the farm for the benefit of herself and the other children. She has in consequence obtained credit, and Tredwell has been considered as destitute of property. The accounts in the neighborhood, after it became generally known that the plaintiff had the conveyance, had been kept with her. Tredwell appeared to live on the farm as her agent merely ; and she has supported the family and made permanent improvements on the farm. The witness was an assessor in Eastchester in 1812, and for eight years afterwards. The first assessment for the farm after the conveyance was to the plaintiff, and the assessment so continued while he was in office. Caleb Morgan says, that he was an assessor in Eastchesser in 1820 and 1821, and during these years the farm was assessed to the plaintiff. He has the assessment rolls for several years, and from them it appears,

that from and including the year 1813, the property has been assessed to the plaintiff, and there is no assessment to Tredwell from the year 1813. Since the spring of 1812, the plaintiff has generally been reputed the owner of the farm, and Tredwell has been considered as worth nothing. The witness heard the deed spoken of as early as the summer of 1812, and it was then generally understood in the neighborhood that it had been made. The plaintiff has had the principal control and management of the farm. There are other witnesses, such as Dixon, Tighe, Willis, Sneden, Angevine and Burpo, who also testify as to the reputed ownership of the plaintiff, and her management and control of the property, from the year 1812 ; but it is not necessary, nor can it be of use, to give their testimony in detail. On the part of the defendant, there was an effort made to show Tredwell in possession of the property, acting as the owner ; but the testimony is too slight to require notice or comment.

It now remains to examine the facts in relation to the judgment of Booraem and Wiggins against Tredwell, which is held by the defendant, and claimed by him as a lien on the farm in controversy. On the 16th of October, 1815, Joseph Skinner, who had married a daughter of Tredwell, gave his note to Stephen Cornwell, which was endorsed by Tredwell, for $1800, payable at six months. This note came to the hands of Mason Seely, and by him it was passed to Wiggins and Booraem, who sued Tredwell, and recovered a judgment against him on his endorsement. On the 8th of August, 1817, an execution issued on the judgment, and a levy was made on the farm. On the 11th of October, 1817, the plaintiff in this cause filed her injunction bill, on the ground of her deed, to which answer was put in. The injunction remained until December, 1820, when the defendant purchased the judgment for $500 ; and the bill was then dismissed, without the consent or knowledge of the plaintiff, by the agent of the defendant. Stephen Cornwell, to whom the note was given, was examined as a witness for the defendant, and made this statement about it : He said, that in the fall of 1815, he sold a vessel to Joseph Skinner, a son-in-law

of Tredwell, and Skinner agreed to give him promissory notes for the purchase, two of which were to be endorsed by Tredwell. Skinner made the notes and gave them to the witness, with directions how to find Tredwell. He went to Tredwell, at his residence in Westchester, and put the notes in his hands to be endorsed, and Tredwell placed his name on them. In his cross-examination, he added that the vessel was sold and delivered to Skinner some time before the notes were drawn ; and that it was a month after the notes were drawn before he went up to Tredwell's to get the endorsement ; that he for some years had been intimate with Skinner, and when he took the notes, considered him as good, and as being able to pay for the vessel himself, or he would not have sold it to him ; but he thought it best to have security.

On this proof, it cannot be pretended that Tredwell was benefitted by the sale of the vessel, or that such sale was made on his credit. The property was passed to Skinner some time before the note was drawn, and it was still after that, when Tredwell was asked for his name. With this in mind, and bearing in recollection that the deed to the plaintiff was in June, 1812, more than three years before the giving of the note, and that the testimony in the cause establishes, that during all this period the plaintiff was in possession of the farm, claiming it as her own, and acting as the owner, we come to the law on this point of the case. The defendant, in setting forth his judgment in his answer, charges it as a lien on the property, but does not distinctly say why. It may be collected, however, from the whole answer, that it was on the ground that the deed was fraudulent, and therefore void in its first commencement, as to all the world except the grantor. On this point of the case I have already passed, and I have nothing to add. There was no actual fraud in the giving or the taking of the deed. No injury was intended, or has been done, to the creditors then existing. The demands of all except the defendant himself, and he had his security, have, as far as appears, been paid ; and one object of the transaction was to accomplish this end.

But it may be said that the deed was voluntary, and is therefore void as to creditors. If a deed is to be treated as voluntary, because no actual consideration passed, then this deed is a voluntary one. But it may well be doubted whether, under the circumstances of the case, the conveyance is to be treated as technically voluntary. It was a new arrangement of property for the purposes of paying debts, and bringing up a family, and the arrangement has answered all its ends. A new owner was created for the property, a new credit obtained, and new means were adopted to pay former debts. Be this as it may, however, a voluntary deed in ordinary cases is protected against subsequent debts. Nearly a century and a half ago, it was said, in the case of *Sagetary* v. *Hide*, 2 *Vern.* 44, that every voluntary conveyance is not therefore fraudulent, but such a conveyance, if there is a reasonable cause for it, may be good and valid even against a creditor. And in *Russell* v. *Hammond*, 1 *Atk.* 15, and *Walker* v. *Burrows*, 1 *Atk.* 94, Lord Hardwicke follows up this doctrine by ruling that voluntary settlements, when the persons making them are not indebted at the time, are not fraudulent, and will not be shaken by subsequent debts. Lord Kenyon, acting as master of the rolls, in *Stephen* v. *Olive*, 2 *Brown's Ch. C.* 90, held that a settlement after a marriage in favor of a wife and children, by a person indebted at the time, was good against subsequent creditors, and not within the statute of frauds. As late as the case of *Kidney* v. *Coussmaker*, 12 *Vesey*, 156, Sir William Grant, in giving his decision, said though there had been much controversy, and a variety of decisions upon the question whether such a settlement was fraudulent as to any creditors except such as were creditors at the time, he was disposed to follow the latest decision, that of *Montague* v. *Sandwich*, which is, that the settlement is fraudulent only against such creditors as were creditors at the time. Chancellor Kent, indeed in this court, in the case of *Reade* v. *Livingston*, 3 *Johns. Ch. Cas.* 500, speculating upon the claims and rights of subsequent creditors, came to the conclusion that they may avoid the settlement, by setting up the prior debts without the consent and against the will of the first creditor. It is not ne-

cessary for the purpose of this cause, to examine very min-
utely this opinion of the learned chancellor. It may not,
however, be improper to say, that it is carrying the doctrine
of fraud rather beyond the English equity cases, and that the
statute does not seem to require such extension. The stat-
ute declares all conveyances, made with intent to delay, hin-
der, or defraud creditors of their just and lawful actions, to
be clearly and utterly void, and of none effect "*only*" as
against the persons whose action by such fraud is disturbed
or hindered. The fair interpretation of this clause, thus
limited, seem to be merely to avoid the conveyance for the
benefit of the existing creditor, leaving the subsequent creditor
to his common law rights. I am aware that the estate be-
coming equitable assets, the English chancellors have let in
the subsequent with the prior creditors. Thus far, perhaps,
we are bound to go, and then I should be willing to return to
the simplicity of former times.

But it is a necessary result from all the cases, that if the
prior debt is extinguished, the subsequent debt cannot reach
the conveyance. And this I take it is the case here. The
demand or action of the female passed away as early as the
fall of 1812, and the debts, with the exception of those of
the defendant, have all long since been extinguished. This
being so, the deed is valid against the judgment of Wiggins
and Booraem ; and such judgment cannot in the hands of
the defendant be held a lien on the farm.

It was strongly urged on the argument, that whatever
might be the merits of the claim of the plaintiff, her right and
those of the defendant were entirely legal, and that therefore
the bill ought to be dismissed. This is an objection which
certainly may be made at the hearing of the cause ; but then
it comes with a diminished force. When the whole strength
of the case is put forth in the bill, the defendant, in all fair-
ness, ought to bring the question up in the first stage of the
cause. If he will answer, and suffer the suit to proceed at
great expense to the parties in order to take his chance of
success on the merits, the case must be strong indeed to
make it necessary for the court to turn over the controversy
to a new course of litigation at law ; as was said by Chan-.

cellor Kent, in *Underhill* v. *Van Cortlandt*, 3 *Johns. Ch. Cas.* 369, "it would be an abuse of justice, if the defendant was to be permitted to protract a litigation to this extent and with the expense that has attended this suit, and then at the final hearing interpose with this preliminary objection." I can see many strong reasons why this bill should be entertained in a court of equity ; but I will not now pass upon them, nor undertake a review of cases. It is enough for my present purpose, that the defendant has submitted the controversy in all its bearings to the decision of the court. He shall now have, what we would have asked if the cause had been with him, a decree on the merits ; and holding, as I do, that the deed from John Tredwell to the plaintiff was not fraudulent, and that it cannot be impeached by the defendant under the judgments against Tredwell now held by the defendant, I shall decree a perpetual injunction against such judgments as far forth as respects the farm held by the plaintiff, and that the defendant release to her the lien claimed by him under his judgments.

The defendant below appealed, and the appeal was argued by

*W. W. McClelan* and *D. B. Ogden*, for appellant.

*W. Silliman* and *J. Tallmadge*, for respondents.

The following opinions were delivered :

Chief Justice SAVAGE, after commenting upon the facts as they appeared from the pleadings and proofs, came to the conclusion that the appellant not only knew of the deed at the time of its execution, but that he advised to the measure and approved of the act. The chief justice then proceeds as follows: The only remaining question in the case is whether the conveyance is fraudulent and void as against the appellant ? Previous to the decision in this court in the case of *Seward* v. *Jackson*, 8 *Cowen*, 406, the law was supposed to be settled that a voluntary conveyance was fraudulent and void as against those who were creditors at the time of the conveyance, but as to subsequent creditors there was no necessary presumption of fraud in their favor ; and as against

such, a voluntary conveyance was good unless shewn to be fraudulent in fact. 3 *Johns. Ch. R.* 481. 5 *Cowen,* 72. Such seems to have been the understanding of the supreme court of the United States. Chief Justice *Marshall,* in giving the opinion of the court in *Sexton* v. *Wheaton,* 8 *Wheaton,* 243, says : " In construing this statute, 13 *Eliz. ch. 5,* the courts have considered every conveyance, not made on considerations deemed valuable in law, as void against previous creditors ; with respect to subsequent creditors, the application of this statute appears to have admitted of some doubt." He then reviews many of the cases decided by Lord *Hardwicke,* and adds : " A review of all the decisions of Lord *Hardwicke* will shew his opinion to have been, that a voluntary conveyance to a child by a man not indebted at the time, if a real and *bona fide* conveyance, not made with a fraudulent intent, is good against subsequent creditors." He supposes the same rule to exist now, and cites with approbation what was said by the master of the rolls in *Battersbee* v. *Farrington,* 1 *Swanst.* 106 : " A voluntary conveyance by a person not indebted is clearly good against future creditors ; that constitutes the distinction between the two statutes, 13*th & 27th Eliz.* Fraud vitiates the transaction ; but a settlement not fraudulent, by a party not indebted, is valid though voluntary." The same doctrine is reiterated in *Hinde's lessee* v. *Longworth,* 12 *Wheaton,* 213, where Mr. Justice Thompson goes farther than had been before decided, and makes use of language applicable to this case : " A deed from a parent to a child, for the consideration of love and affection, is not absolutely void as against creditors. It may be so under certain circumstances ; but the mere fact of being indebted to a small amount would not make the deed fraudulent, if it could be shewn that the grantor was in prosperous circumstances and unembarrassed, and that the gift to the child was a reasonable provision, according to his state and condition in life, and leaving enough for the payment of the debts of the grantor. The want of a valuable consideration may be a badge of fraud ; but it is only presumptive, and not conclusive evidence of it, and may be met and rebutted by evidence on the other side." The doctrine just quoted was ci-

ALBANY,
Dec. 1830.

Pell
v.
Tredwell.

ted with approbation in the decision of *Seward* v. *Jackson*, 8 *Cowen*, 406. This subject was there treated with great ability, and the proposition established by the opinions delivered, that "a conveyance or settlement in consideration of blood and natural affection, though by one indebted at the time, is only *prima facie*, and not *conclusive* evidence of fraud."

Assuming this to be the law, let us inquire whether there is any evidence of a fraudulent intent in the execution of the deed in question. John Tredwell was indebted, at the time of the execution of the deed, principally to the appellant, who states in his answer that the indebtedness at the time of the conveyance was $6,601,11, and the evidence shews that the property covered by his mortgages was worth more than $9000. It seems also to have been understood by all concerned, that Tredwell's existing debts must be paid. If there was an intention to defraud any one, it was Mrs. Brevoort. But even if the deed was not to be considered operative as to creditors generally, the *appellant* should be concluded by it; it must be considered that he advised this proceeding to secure the property to a family to which he stood, by virtue of his engagement to his dying sister, in the relation of a parent; he intended it as a provision for the family, and therefore should not be permitted to deprive them of it. There was no fraud about it; although the conveyance covered the whole, yet it was well understood that there was property enough to pay the appellant, independent of the property now in question. Considering, therefore, the appellant as a prior creditor, the execution of the deed under the circumstances of the case must be deemed a fair transaction, and the appellant was properly restrained from selling the farm by virtue of his execution.

As the assignee of Wiggins and Booraem, the appellant ought to be considered as a subsequent creditor; and as to such, the law was always understood, that the voluntary conveyance for the benefit of a man's family was never more than *prima facie* evidence of fraud, and liable to be rebutted. The circumstances which are evidence of fraud in such cases are continuing in possession after the conveyance, acting as owner, and thereby obtaining a false credit, and thus impos-

ing on those with whom the grantor might contract. Nothing of that kind can be sustained in this case. Notice was immediately given of the change in the title, and John Tredwell lost, while Hannah gained credit. John Tredwell does not appear, subsequent to the deed, to have contracted debts on his own account; nor did the contract on which the judgment of Wiggins and Booraem was obtained depend at all on his credit. The vessel, which was the consideration of the note, was sold and delivered before the note was endorsed by Tredwell; his name seems to have been obtained as an additional security merely. The circumstances seem to have been understand by the appellant, as he gave but $500 for a judgment of a much greater amount.

On the whole, therefore, I am of opinion that the decree of the court below should be affirmed.

By Mr. Senator OLIVER. The important question in this cause is, whether the appellant assented to the deed from John to Hannah Tredwell. It is proved that he procured or assisted in a survey of the premises; that the boundaries of the survey were sent to him; that they were afterwards inserted in the deed in question; that the deed, when prepared, was read at a meeting of the family and their friends, or some of them; and that the appellant was present and made no objection. It also appears that the appellant, after the deed was executed, was instrumental in having a debt against John charged to Hannah. There are also many other facts in the case which go to establish this assent. It would seem, therefore, that the appellant must have assented to the deed. His conduct, as well subsequent as prior to the execution of the deed, is totally irreconcilable with any other inference than that of his assent.

If the execution of this deed was assented to by Mr. Pell, it was certainly a waiver of all *his* claims upon the land. Chancellor *Kent,* in *Wendell* v. *Van Rensselaer,* 1 *Johns. C. R.* 354, says: "There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares that if one man knowingly, though he does it passively by looking on,

suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his *legal rights* against such person."

If Mr. Pell had intended to have held the premises included in this deed for the debts which John Tredwell owed him, he should have taken from Hannah Tredwell the requisite security. Shall he be allowed to allege that the deed was fraudulent, and that he himself was a *particeps criminis?* Certainly not; and he cannot, therefore now be allowed to make this property chargeable with the debts which John Tredwell owed him at the time of the conveyance.

The land in question is not liable to the judgment of Booraem and Wiggins. It may be doubted whether this conveyance was a voluntary one, within the technical meaning of the term; but even if it was, there is no authority except some *obiter dicta,* which would make it void in favor of *subsequent* creditors. If, however, the *dicta* of Chancellor Kent, in 1 *Johns. C. R.* 481, are to be considered as authoritative; which cannot be assented to, there are even then doubts whether the judgment of Booraem and Wiggins ought to be collected out of the land in question. The circumstances attending this cause seem to repel the presumption of fraud arising in law, from the fact of the party being indebted at the time. The *subsequent* acts of the parties strengthen this presumption; for there is now no debt that we know of, existing at the time of the conveyance, but what has been paid or adjusted. As the suit brought against John Tredwell for a breach of promise of marriage was abandoned, it may be doubted whether the plaintiff in that suit can now be considered as being even then a creditor within the meaning of the statute; at all events, *subsequent creditors* ought not, I think, be allowed to set up the indebtedness of John Tredwell to the plaintiff, and thereby to avoid the deed. But even if Booraem and Wiggins could have set up their judgment against the former, (which it has been already shewn they could not,) still it does not follow that Mr. Pell, as their assignee, could. He bought the judgment, for aught that appears, without the consent of Hannah Tredwell; and

ALBANY,
Dec. 1830.

Pell
v.
Tredwell.

inasmuch as he had assented to her conveyance, he ought not now to be allowed to alledge that the conveyance to her was fraudulent. If this conveyance was good as against him as a prior creditor, it ought to be held good against him as a *subsequent creditor*.

Although the respondent might have had a remedy in a court of law, yet she has a more complete one in equity ; and this coupled with the fact that the appellant did not raise the question till the argument, is a sufficient answer to this point. *3 Johns. Ch. C. 369.*

The decree ought therefore to be affirmed.

This being the unanimous opinion of the court, the decree of the court below was thereupon AFFIRMED.

---

The remainder of the cases in errors in the next volume.

---