Thompson v. Cohen.

THOMPSON *et al., Executors*, v. COHEN *et al., Appellants.*

Division Two, March 5, 1895.

1. **Fraudulent Conveyance.** A deed, although made in fraud of the grantor's creditors, is not a nullity; it is valid as between the parties and can be avoided only by creditors and subsequent purchasers.

2. ———: ESTOPPEL. A creditor who knowingly acquiesces in a sale and accepts benefits arising from it can not afterward assail it on the ground that it was made in fraud of creditors.

3. ———: EXECUTION SALE: PURCHASER. Where property is sold under execution, the purchaser may permit the execution debtor, though insolvent, to hold and enjoy it, and it will not, in such case, be subject to further sale for any unpaid sum due on the judgment under which it was sold.

4. **Estoppel:** PLEADING. Estoppel *in pais*, to be available, must be pleaded.

*Appeal from Madison Circuit Court.*—HON. JAMES F. GREEN, Judge.

REVERSED.

*M. L. Clardy, Robt. A. Anthony* and *M. R. Smith* for appellants.

(1) Under the practice in this state, equity cases are practically triable *de novo* in the appellate court. *Blount v. Spratt*, 113 Mo. 54; *Benne v. Schnecko*, 100 Mo. 258; *McElroy v. Maxwell*, 101 Mo. 308. (2) When

a court of equity once acquires jurisdiction of a case, if authorized to act at all in the premises, it will, to avoid a multiplicity of suits, do adequate and complete justice between the parties. *Savings Inst. v. Collonious*, 63 Mo. 205; *Baile v. Ins. Co.*, 73 Mo. 384. (3) There was no evidence that Philip Cohen furnished any money whatever with which W. L. Cohen made the purchase of W. A. Hargadine of the property in dispute, on the third day of March, 1882, for an adequate consideration, and the judgment of the court below should have been for defendants. *Keiser v. Gammon*, 95 Mo. 224; 1 Greenleaf on Evid., sec. 74; Bump on Fraud. Convey. [2 Ed.], 581 and 585. The burden of proof is on the party who assails the conveyance, and if he do no more than create an equilibrium he fails to make his case. *Kaine v. Weigley*, 22 Pa. St. 179; *Carter v. Gunnells*, 67 Ill. 270. (4) It appearing that W. L. Cohen paid an adequate and valuable consideration for the property, it will be presumed that the purchase was fair and honest, and the proof must be clear that it was the contrary and fraudulent. *Dallam v. Renshaw*, 26 Mo. 533; *Ames v. Gilmore*, 59 Mo. 543; *Funkhouser v. Lay*, 78 Mo. 462; Bump on Fraud. Convey. [2 Ed.] p. 585. (5) The deed of W. A. Hargadine and wife, dated March 3, 1882, to W. L. Cohen is a good and sufficient deed between them, and can not be assailed for fraud, by the said Hargadine in his individual capacity, as undertaken in his petition in this behalf. Bump on Fraud. Convey. [2 Ed.] p. 472; *Gutzweiler v. Lackman*, 23 Mo. 173; *Jacobs v. Smith*, 89 Mo. 681; *George v. Williamson*, 26 Mo. 192. (6) The attempted purchase of W. A. Hargadine, for himself only, at sheriff's sale, on executions issued on judgments in favor of Wm. F. O'Bear, in favor of W. A. Hargadine and Hugh McKittrick for themselves individually, and Wm. A. Hargadine and Henry W. Elliott executors of

the estate of Wyman Crow, and in favor of the A. F. Shapleigh Hardware Company, on the twenty-seventh day of March, 1889, was fraudulent, as to the other creditors for whom he admitted himself to be trustee, and is therefore void. *Thornton v. Irwin*, 43 Mo. 164; *Dillinger v. Kelley*, 84 Mo. 566; *Roberts v. Mosley*, 64 Mo. 510; *Peacock v. Nelson*, 50 Mo. 261; *Damschraeder v. Thias*, 51 Mo. 103; 2 Perry on Trusts [2 Ed.], sec. 602, p. 173; 1 Perry on Trusts [2 Ed.], sec. 195. A trust may be created by parol. This trust had in part been executed. 1 Perry on Trusts [2 Ed.], sec. 75, p. 58. (7) The decree rendered by the court in this cause is inequitable and unjust, and can not be maintained, and on plaintiff's petition in this behalf can not by this honorable court be reformed. *Keiser v. Gammon*, 95 Mo. 223; *Woodard v. Mastin*, 106 Mo. 364. (8) If W. L. Cohen bought the property in dispute for an adequate consideration held by W. A. Hargadine in trust for a certain set of creditors of Philip Cohen, which consideration was ratably distributed among such creditors, can they be heard by their trustee, or in any other manner against the deed, and would not such a conveyance be valid, though the property was bought for Philip Cohen, which, of course, respondents deny? *Gutzweiler v. Lackman*, 23 Mo. 171; Bump on Fraud. Convey. [2 Ed.], sec. 597. (9) A creditor must return the benefits when he desires to avoid a deed through which he was paid his debt. Bump on Fraud. Convey. [2 Ed.], p. 464; *Glass Co. v. Baldwin*, 27 Mo. App. 54; *Stoller v. Coates*, 88 Mo. 522.

*B. B. Cahoon, Wm. N. Nalle, Wm. Carter & Weber* for respondents.

(1) The decree is supported by the evidence, and should be affirmed, even though the evidence was more conflicting than it is. *Gottschalk v. Kircher*, 109 Mo.

170; *Benne v. Schnecko*, 100 Mo. 250; *McElroy v. Maxwell*, 101 Mo. 294. (2) Equity cases, if there is enough evidence in the record to justify the decree, will not be reversed because incompetent evidence was admitted, but will, by this court, be disposed of on the whole testimony deferring somewhat to the finding of the court below *Blount v. Spratt*, 113 Mo. 54; *Barrett v. Davis*, 104 Mo. 549; *Davis v. Kline*, 96 Mo. 401; *Bush v. Arnold*, 50 Mo. 17. (3) The evidence shows a common purpose of both the defendants, who are half brothers, to defraud the creditors of Philip Cohen, who has always remained in possession of the goods and the real estate in question. Hence all the declarations and acts of Philip Cohen, including other fraudulent dispositions of his property before and after the deed of Hargadine to William L. Cohen of March 3, 1882, are admissible, whether made in the presence of William L. Cohen or not, and circumstances may (and in this case do) show that William L. Cohen knew and participated in the fraud of Philip. *Weinrich v. Porter*, 47 Mo. 293; *Erfort v. Consalus*, 47 Mo. 208; *Holmes v. Braidwood*, 82 Mo. 610, 614, 615; *Leeper v. Bates*, 85 Mo. 224–228; *Hopkins v. Sievert*, 58 Mo. 201; *Burgert v. Borchert*, 59 Mo. 80; *Leavitt v. LaForce*, 71 Mo. 354; *King v. Moon*, 42 Mo. 551; *Singler v. Goldenburg*, 17 Mo. App. 549; Bump on Fraud. Convey [3 Ed.] 582. (4) Being purchased with the profits from the store business and sale of the goods in it, which were Philip Cohen's, the real estate was, under the facts of this case, his, although conveyed to William L. Cohen, and it could be by Hargadine sold to pay Philip Cohen's debts. *Peck v. Land*, 2 Ga. 1; *Zoll v. Soper*, 75 Mo. 460; *Jackman v. Robinson*, 64 Mo. 289; *Lionberger v. Johnson*, 88 Mo. 456; *Bobb v. Woodward*, 50 Mo. 95; *Ryland v. Callison*, 54 Mo. 513. (5) The pretended sale of the stock of

goods in October, 1880, to Wm. L. Cohen and the alleged employment of Philip Cohen, the debtor, was fraudulent as to the creditors of Philip Cohen, whether the sale be claimed, under the executions or under the bill of sale, because the change of possession from Philip or Emma C. Cohen to Wm. L. Cohen has never been actual, visible, exclusive, open, notorious, substantial, continued and unequivocal in Wm. L. Cohen. *Betz v. Connor*, 7 Daly, 550; *McCarthy v. McDermott*, 10 Daly, 450; *Peck v. Land*, 2 Ga. 1; *Hurburd v. Bogardus*, 10 Cal. 518; *McKibbin v. Martin*, 64 Pa. 352; *Claflin v. Rosenberg*, 42 Mo. 439. (6) There has been no laches by plaintiff in bringing this suit. *Zoll v. Soper*, 75 Mo. 460; *Bobb v. Woodward*, 50 Mo. 99; *Potter v. Stevens*, 40 Mo. 229; *Lionberger v. Baker*, 88 Mo. Mo. 455. Nor were any laches pleaded. The limitation in this action is ten years. *Sherwood v. Baker*, 105 Mo. 477; *Rogers v. Brown*, 61 Mo. 191; *Hunter v. Hunter*, 50 Mo. 451. (7) No plea of defect of or necessity of other parties as plaintiff or that any one other than plaintiff has an interest in this suit and no estoppel in *pais* or otherwise by plaintiff to bring this action ever existed or has been pleaded. *Noble v. Blount*, 77 Mo. 235; *Bray v. Marshall*, 75 Mo. 327; *City v. Schulenburg*, 98 Mo. 613; *Blodgett v. Perry*, 97 Mo. 263; *Galbraith v. Newton*, 39 Mo. App. 581; 82 Mo. 402; *Blodgett v. Perry*, 97 Mo. 263; 51 Mo. 449; *Martin v. Johnson*, 23 Mo. App. 96.

GANTT, P. J.—This is a proceeding in chancery to divest the title of a certain two story brick store building in Fredericktown, Madison county, out of William L. Cohen and vest the same in William A. Hargadine. Since the commencement of the suit and judgment in the circuit court, Mr. Hargadine has died, and his executors, the respondents have been duly substituted in

his stead.    The circuit court decreed the divestiture as prayed, and the defendants have appealed.

For many years prior to 1879, Philip Cohen had been a dry goods merchant in Fredericktown, and in that year failed.    He was indebted to various wholesale houses in St. Louis.    An effort was made by him to obtain an extension and a compromise of his indebtedness, but it proved ineffectual, and certain of his creditors began suit at once and obtained service while he was yet in the city of St. Louis.    From this circumstance they have been denominated in this record his unfriendly creditors.    The others, who were disposed to grant some concessions, also began suit at once in Madison county, where he lived, and it would appear that he purposely permitted these last to obtain their judgments before the unfriendly creditors could get theirs in the city.    The friendly creditors at once levied upon and seized Philip Cohen's stock of goods and his store building, the real estate involved in this suit.    In due time all the property, both real and personal, was sold and was bought in by Crow, Hargadine & Company, in trust for themselves and the other friendly judgment creditors, acting with them.

After this purchase was made, Crow, Hargadine & Company, through their trusted agent, Mr. Swain, and the other creditors through Mr. Fischer, acting by and with the advice of Messrs. Nalle and Edwards, the local counsel at Fredericktown, who had obtained the judgments and represented the friendly creditors in the whole transaction, sold the stock of goods to Mrs. Emma C. Cohen, the wife of Philip Cohen, and took her note for $2,000 therefor, secured by a deed of trust on a farm of hers in Wayne county she had inherited from her father.    Mr. Swain testified that Nalle and Edwards made the arrangement for the sale to Mrs. Cohen, and fixed up the papers, took her note and the

deed of trust. After she had executed these instruments, he says he was directed by Messrs. Nalle and Edwards to deliver the goods to her, and thereupon he says: "I took the keys over to her house and gave them to her, telling her she was the owner of the goods; that the property was hers and I wanted she should treat them accordingly, and she said, 'Yes sir.' " It is admitted by Mr. Hargadine that this note was paid to him and its proceeds distributed among the friendly creditors.

After this store was reopened and the business resumed in the name of Mrs. Cohen, W. L. Cohen testified that he let them, Philip and his wife, have about $4,000 to restock the store.

In the meantime, the so-called "unfriendly" creditors were proceding with their actions, and in due course of law obtained their judgments and at once proceeded to levy executions on Mrs. Cohen's stock of goods, claiming it was her husband's, and was simply covered up to avoid the debts.

At this juncture Philip Cohen took the sheriff of Madison county to Chester, Illinois, where his half brother, William L. Cohen, resided. He sought the aid of William L. Cohen to make a bond, but William declined to go on the bond but said he would come to Missouri and investigate. He testifies that when he reached Fredericktown in April, 1880, he first ascertained the condition of affairs, and employed Mr. B. B. Cahoon, a member of the local bar, and advised with him about buying the judgments of the unfriendly creditors, under which the stock of goods had been seized. He then went to St. Louis and bought the judgments. Mr. Cahoon represented him in seeing that they were properly assigned to him.

The testimony of Messrs. Jones and Metcalf, the counsel who represented the unfriendly creditors in St.

Louis, discloses that Mr. Binswanger made several propositions of compromise, all of which were rejected until he finally offered seventy-five cents on the dollar, and they concluded to accept it; that thereupon Mr. Binswanger introduced William L. Cohen as the person who would pay the money, and asked to have the various judgments assigned to him to protect him in so doing; that thereupon the sum of $3,114.89 was paid over by J. Meyberg & Company, of St. Louis, for W. L. Cohen, Cohen then and there directing Meyberg to draw on him at Chester, Illinois, for $1,600 of the amount. This draft is in evidence, and was paid by W. L. Cohen. Having obtained the judgments, under the advice of Mr. Cahoon, he took a bill of sale from Emma and Philip Cohen to the stock of goods and directed executions to issue on the judgments, and had the goods sold under them and bought them in.

Having bought the goods, he opened the store and ran it from that time until the commencement of this suit in 1889 in the name of William L. Cohen. He testifies he employed Philip, his brother, to run the business for him. He says, "I told him I would allow him to take a living out of the business, and if it afterward paid, I would give him a salary."

The evidence tends to establish very clearly that William Cohen continued to reside in Illinois; that he dealt largely in horses and mules, and owned several valuable farms in Illinois and Missouri; that he was a man of good financial standing, worth at least $40,000; that he entrusted the mercantile business in Fredericktown to Philip; that while the business was done in the name of William L. Cohen, Philip was the resident manager. He deposited the cash in St. Louis with Meyberg & Rothschilds in the name of William L. Cohen and drew it out by drafts signed "William L. Cohen, per Philip." Mr. Hargadine was advised as

early as 1881, that the business was being done by Philip in William L. Cohen's name. William went to the business house of Crow, Hargadine & Company, and notified them not to let Philip buy on credit on his name. Philip Cohen continued to buy goods of Crow, Hargadine & Company in the name of William L. Cohen.

On the thirty-first day of August, 1881, Crow, Hargadine & Company addressed the following communication to William L. Cohen:

"August 31, 1881.

"*William L. Cohen, Esq., Chester, Ill.*

"DEAR SIR:—Those creditors of your brother, Philip Cohen, who are interested in the store and other property held for them in the name of our Mr. Hargadine, are very desirous of having the matter closed up in some way that they may realize something from it, and have determined that, unless some other arrangement can be made, they will pay off whatever lien Judge Schulte may have on the property and take possession and dispose of it. Prior to taking this action, they make this proposition: If you or your brother will pay them fifteen hundred (1,500) dollars, Mr. Hargadine will make a quitclaim deed conveying the property to whoever you may name. This property is well worth $4,000, and probably more. Judge Schulte's claim, as he states it, is something less than $2,000. So you would be saving at least over $500 by making this settlement.

"Your favorable consideration of this proposition and an early answer are desired, and are important, as the creditors in interest will proceed in the other direction without delay if this or some other satisfactory arrangement is not concluded.

"Yours very truly,

"CROW, HARGADINE & Co.

"Per Swain."

To this, William L. Cohen replied:

"*Messrs. Crow, Hargadine & Co., St. Louis, Mo.*

"GENTLEMEN:—Yours of August 31 at hand. I am very busy now and can't leave home at present; will give the matter my attention as soon as possible; will write to my brother, and will be in St. Louis this fall and try and arrange matters.

"Yours, etc.,

"WM. L. COHEN.

"Hope this will be satisfactory to you, etc.

"COHEN."

On the twelfth of September following, Philip Cohen went to St. Louis, as did William L. Cohen. Philip went to see Mr. Hargadine, and, after talking the matter over, Mr. Hargadine signed and gave him the following agreement:

"CONTRACT OF SALE TO W. L. COHEN, SEPT. 12.

"The undersigned, as trustee for Crow, Hargadine & Co., owns a certain store in the town of Fredericktown, Mo., now occupied by W. L. Cohen, formerly belonging to Philip Cohen and bought of him at sheriff's sale, agrees and hereby obligates himself to make a quitclaim deed to W. L. Cohen on the following terms: $500 in cash, the receipt of which is hereby acknowledged; $500 the last day of January, 1882, and $500 on the first day of March, 1882, deed to be made and delivered to W. L. Cohen when the final payment is made.

"WM. A. HARGADINE."

On February 27, W. L. Cohen remitted the last payment to Crow, Hargadine & Co., with request to make the deed to him and transfer insurance to him; and thereupon the following letter was sent him:

"*Wm. L. Cohen, Esq., Fredericktown, Mo.*

"DEAR SIR:—We enclose receipt for $500 remitted in your favor of the 28th inst., also our Mr. Hargadine's quitclaim deed, conveying to you the storehouse

as agreed.   The policy of insurance we are not able to find, but think that Philip has it; if not  we will make further search.     Yours very truly,

"CROW, HARGADINE & Co.

"Per Swain."

Enclosed was the  quitclaim deed in common form to the property in question from William A. Hargadine and wife to William L. Cohen of Chester, Illinois;  consideration, $1,500;  and  duly recorded in Madison county, Missouri.

Mr.   Hargadine testified in his own behalf, and, in answer to the question how he came to make this proposition to Wm. L. Cohen, said:  "I can  only answer that by saying that the creditors here all wanted to get rid of it and *it was understood* that  William L. Cohen *was helping his brother* Philip, and we addressed him the letter there.   *By the way, I believe* William L. Cohen was then running the  business, or  Philip was running it under his name, in this store building;  that is what I understand."   He was asked if he had known at that time that Philip was buying the property under cover of W. L. Cohen  to cheat and defraud his creditors and use it for his own benefit to carry on a mercantile business in William's name, if he would have made the deed, and he answered:   *"I would not have made the deed to anybody, unless I thought I was getting a proper price for the property.   I didn't know that Philip was doing anything more than what he ought to do, and considered when I went into that agreement to sell that property for $1,500 that I was getting its value, including, of course, the liens that were on it."*

In regard to the title acquired by the firm under the sheriff's deed, he testified that his directions were to have the storehouse and lot conveyed to him; that was  the universal practice;  that  this property was always  carried  as firm property on the books of Crow,

Hargadine & Company, and when he made the contract to sell and deed to W. L. Cohen he supposed the whole title was in his name; that he had a provision in his will setting forth that all property that appeared on the ledger of Crow, Hargadine & Company belonged to that firm; that when he sold to W. L. Cohen he undertook to sell what he supposed had been conveyed to him by the sheriff. He did not intend to sell him three tenths interest in the lot, but all of it. The proceeds of that sale were prorated among all the creditors, and he offered to have all the other partners sign the deed, but they all treated it as partnership property. He was asked, when he concluded there was fraud in the matter, and said it was the twenty-seventh of November, 1885. He was then asked this question:

"*Q.* You don't claim to have any facts upon which to predicate you opinion as to the fraudulent conduct of Philip Cohen, other than as you stated a while ago, viz., 'that he had agreed to pay,' he hadn't paid, and acted the rascal in making appointments to pay and not coming to see you, and so forth? *A.* "*I have no specific facts.* I only have the general lay of the land, which is already correct. I told you I had no specific information, *only on general principles.*

"*Q.* You don't claim yourself to be cognizant of any facts? *A.* None at all."

There was much said about fraud in the acquisition of the goods by Mrs. Emma Cohen, but when Philip Cohen was on the witness stand and being examined in regard to that transaction, the record recites: "*It is here admitted by W. N. Nalle, one of the attorneys for plaintiffs, that Mrs. Cohen was put into possession of the goods bought by her from Swain, and that the transaction was bona fide.*"

Other facts will be noted, if necessary, in the further discussion of the case.

I.   This case was heard at the October term, 1893, and the judgment of the circuit court affirmed, but, upon motion, a rehearing was granted and it has been more fully argued at this term.

The suit is brought to set aside a deed executed by the plaintiff to the defendant William L. Cohen on the ground that it was obtained as the result of a fraudulent conspiracy between Philip and William Cohen to hinder and delay the creditors of Philip and that the grantor therein, Mr. Hargadine, was entirely ignorant of said fraudulent purpose in obtaining said deed and the uses to which it has since been put.

The answer of both defendants fully and specifically denies all fraud and conspiracy on their part, and all ignorance on the part of Mr. Hargadine of the purposes for which the property was purchased, but, on the contrary, avers that William A. Hargadine intended and understood to convey, and did convey, to William L. Cohen the full and absolute fee in the real estate in suit with full knowledge of all the facts and circumstances surrounding said sale, and that William Cohen bought and paid $1,500 therefor, subject to a mortgage of $2,300 thereon.

It will thus be seen that, to recover in this case, plaintiffs must establish two things:  *First*, that the consideration of the deed herein impeached was fraudulently paid out of Philip Cohen's money; and, *second*, that Mr. Hargadine was ignorant of that fact and did not consent to it, at the time he made the conveyance.

The accepted construction of our statute against fraudulent conveyances is that the deed is not a nullity. It is valid as between the parties and can only be avoided by creditors and subsequent purchasers.

Consequently, it has been generally held, both in England and the various states in this Union, that if a deed is made which a creditor may avoid if he sees

fit, yet if he knowingly acquiesces in a sale and accepts the benefits arising from it, he can not repudiate it. *Gutzweiler v. Lackman*, 23 Mo. 168.

Neither will it be sufficient to show that William Cohen bought this property intending that his insolvent brother should have the benefit of it. One has a right to purchase the property of another and hold it for his benefit, or permit him to enjoy the benefit of it. *Gutzweiler v. Lackman*, 28 Mo. 434; *Clark v. Cox*, 118 Mo. 652.

This property was once subjected to all the demands of the law, and Crow, Hargadine & Company became its owners. Their title was undisputed. Philip had made no fraudulent transfer of it, as is often the case in insolvency. The only lien upon it was one of long standing to secure Judge Schulte against a contingent liability, and this was of record, and plaintiffs had counsel of recognized ability residing in the same town with this mortgagee, and they were free to inquire and ascertain the amount of the balance due thereon. Having become the owners of this store property, plaintiffs' testator and his copartners held it for two years. Neither William Cohen nor Philip Cohen had expressed any desire to purchase it. The record is absolutely barren of any evidence that they had made even the slightest effort to regain it, nor had they, by word or insinuation, depreciated its value, nor had they made any statement to plaintiffs of the amount unpaid on Schulte's deed of trust. There is not a suggestion in this whole record that Mr. Hargadine was ignorant of any fact that would have enabled him to form a correct opinion of the value of this property, beyond the contention that Philip did not owe the amount of $2,000 to Judge Schulte. But the information as to that was accessible to him, and, even if not, how can it be charged as a fraud on the part of either William or Philip.

They made no statement in regard to it.    Mr. Harga-
dine's counsel labored hard to get him to say he would
not have sold it to William if he had known that Philip
was going to use it as a cloak from his creditors, but
he answered very promptly that he sold it because he
thought he was getting its value.   He knew Philip was
occupying it.   He knew he was doing the business in
William's name, as well before he made the deed as
after, and he frankly testified that he knew no specific
fact, even at the time of taking his deposition, that he
considered a fraud, except the failure of Philip to pay
him.   Surely, it can not be charged that the taking of
the deed to William Cohen was a fraud on this particu-
lar sale of creditors when the suggestion that he should
do so, is made by themselves.   It is difficult to under-
stand exactly in what way Mr. Hargadine was de-
frauded.

Judges and law writers have vainly endeavored to
find a sufficiently comprehensive definition for fraud,
but usually when applied to the acquisition of property
it means a deception practiced upon another whereby
he is induced to part with his property or surrender
some right therein; and the suppression of the truth,
when good conscience requires one to speak, is as rep-
rehensible as the statement of that which is false.   If
there can be found in this voluminous record a single
misrepresentation of a fact by either Philip or William
Cohen that induced Mr. Hargadine to make them this
offer of sale, it would greatly aid plaintiffs' case, but I
have not been able to find any such.   If there is any
fact in regard to the situation of this property, its con-
dition, its suitability as a storehouse, the town in
which it was located, or the condition of the title
thereto, that was not known to Mr. Hargadine and his
attorneys and agents, it nowhere appears in this record.

If there is anywhere in the record any evidence that Mr. Hargadine was not capable of conducting a business transaction, even of the most stupendous magnitude, we have not been able to find it, and would be loath to believe it if we did. If there is a single representation of William or Philip Cohen, either to Mr. Hargadine or any other person, regarding the condition of this property, *or its value or for what purpose or in whose behalf, either of them was buying it,* we can not find it. That William Cohen paid Mr. Hargadine the price demanded and obtained his deed without engaging in any misrepresentation at the time, it seems to me, must stand as an uncontrovertible fact.

Stress is made in the argument on the purchase of the goods by Mrs. Cohen, but it must be evident that, whatever turpitude, if any, there was in that transaction, can not be used against William Cohen. There is not a word of evidence connecting him in the most remote degree with that transaction until it was entirely completed and she in possession with the full knowledge of plaintiffs, and it was conceded and admitted by Judge Nalle that her purchase was *bona fide*, and surely the stipulation of honorable counsel of record can not be gainsaid in this court. But, moreover, Mr. Swain's testimony shows that every step in that trade was taken with the full knowledge and assistance of plaintiffs' counsel and agents; that they received every dollar of the consideration they demanded for those goods, and it does not lie in their mouths, after thus appropriating the fruits of that transaction, to stigmatize it as a fraud, whatever other creditors might do.

So that Mr. Hargadine knew of the sale to Mrs. Cohen, and he collected the full amount of her note. He knew he was the owner of the house in which Philip was doing business, and he knew that the busi-

ness was done in William's name.    When he got ready
to realize on his investment, he did not open negotia-
tions with Philip, but he wrote directly to William at
Chester.    He knew Philip Cohen had no apparent
means to purchase the lot, and, of his own volition, he
proposes a scheme by which even Philip may have .the
benefit of that lot, and he proposes to make the deed to
*whomsoever they might direct.*   If, then, Philip Cohen
furnished the money to Mr. Hargadine, under his own
proposition, and the deed was made to his brother,
William, *upon Mr. Hargadine's own suggestion, it was
not fraudulent as to him and those he represented, for he
was consenting to the very act himself, indeed was the
chief actor in it, and profited by it and still retains the
fruits of it.*   As said in *Phillips v. Wooster*, 36 N. Y.
415, "surely the maxim, *volenti non fit injuria*, must be
admitted to be applicable in such a case.    It is no
matter, therefore, whether he was a creditor *at the time*
or not.    Admitting that he was, he has excluded him-
self from the advantage which the statute provides for
creditors in such cases."   The effect of such a trans-
action is that the creditor has consented to exempt it
from any liability to him.

Thus in *Thompson v. Thompson*, 82 Pa. St. 378,
the plaintiff had loaned a husband some money with
which to purchase a piece of land and had advised the
purchase and was present when the deed was made to
the wife and subscribed as a witness thereto; he was
afterward held estopped from charging the deed was
fraudulent as to him and the purchaser under his judg-
ment against the husband for the loan.

In *French v. Mehan*, 56 Pa. St. 286, Mehan being
indebted to Dickerson purchased of him (Dickerson),
a tract of land and caused it to be conveyed to Mehan
and wife, creating an estate by entirety.   Afterward,
Dickerson obtained judgment against Mehan and sold

the land thereunder, and French bought.   Mehan died and French brought ejectment on the theory that, as Mehan was indebted, at the time of the conveyance to his wife, and had furnished the purchase money, the deed to Mrs. Mehan was fraudulent as to Dickerson and those purchasing under his judgment.   But the trial court charged the jury that:   "It can hardly be presumed or inferred that the deed was made to the wife for the purpose of hindering and delaying the grantor in the collection of the debt due by the husband.   It seems to me that both he and the purchaser, under his judgment obtained by him for such indebtedness, would, and ought to, be estopped from making any such allegation.   If the conveyance to the wife was intended to hinder and delay creditors, then the grantor was a party to the fraud, and neither he nor anyone claiming title under or through him ought to be permitted to allege the fraud, or to derive any advantage therefrom."   Upon a judgment in favor of the wife, the purchaser appealed, but the supreme court unanimously affirmed the judgment.   See, also, *Schenck v. Hart*, 32 N. J. Eq. 774.

In *Sharpe v. Davis*, 76 Ind. 17, the deed was made to the daughter of an embarrassed debtor, by the wish of his judgment creditor.   Subsequently the land was purchased by the judgment creditor and a sheriff's deed executed to his assignee.   Judge ELLIOTT says: "Nancy Davis suggested and directed that the conveyance should be made to Lottie Davis.   It was made by Nancy's son in obedience to her wish.   She is, therefore, not in a situation to denounce, as fraudulent, that which she herself procured to be done."   See, also, *Pell v. Tredwell*, 5 Wend. 661, *loc. cit.* 698 and 699.

In *Lemay v. Bibeau*, 2 Minn. 291, the court says: "There can be no doubt but that a conveyance of real estate in due form, even if made with the intent to

defraud creditors, is good as between the parties and privies and can only be avoided by a creditor of the fraudulent grantor.   *   *   *   And the creditor may have his election either to confirm the conveyance, or attempt to avoid it, *but he can not do both*.  He can not receive a benefit under the conveyance, and then turn round and claim that the conveyance is fraudulent and void.   *   *   *   He can not hold on to such part of the contract as may be desirable on his part and avoid the residue, but must rescind *in toto*, if at all, and the party who would disaffirm a fraudulent contract, must return whatever he has received upon it."

In the case at bar, Mr. Hargadine received $1,500. as the consideration of his deed, he has retained it all these years, and he can not now, after inducing William L. Cohen to change his relation to this property and pay off the balance on the Schulte mortgage, repudiate his own deed as fraudulent.

This exact question was discussed by the High Court of Chancery of England in *Olliver v. King*, 8 De G. M. & G. 110.   The suit was brought by the executors of John King to set aside a deed of gift made by James King to his sons, John Richard and Morris King, and subject the property to a bond executed by James King to John King.   It appears that James King at all times had great confidence in his brother John, and, being ill in 1842, consulted John about his affairs, the result being the execution of the deed impeached in that suit.   Lord Justice TURNER, in declaring the judgment, said:   "The deed was suggested by John, was prepared according to the instructions given by John, John himself procured the execution of it by James, and by John Richard and Morris, the sons of James.   The whole transaction appears to have been carried through, in fact, by the acts and concurrence of John.   At all events, the deed

was executed with his full consent and concurrence, and I think that he could not have been permitted to say * * * that the deed thus executed with his full consent and concurrence was a fraud upon him within the meaning of the provisions of the stat., 13 Eliz. c. 5. * * * Suppose John had executed the deed for the purpose of testifying his consent to the transfer of the leasehold property by that deed, *could he then have impeached the deed? I apprehend that he clearly could not;* and if he could not, there is nothing which he has done falling short of the execution of that deed, except that there is not his pen put to the paper by which that property was transferred. * * * My opinion is based upon this: I consider the true effect of this transaction to be, that John, by his conduct, agreed to this alienation of the assets, and must be considered to have consented to take satisfaction out of the property which remained."

If the brother in that case was bound by his silence and procuring the execution of the deed, although a creditor to a large sum, *a fortiori* must Mr. Hargadine and his associates be held bound, not only by his suggestions, but, by his own deed, made on his own terms, *to have released this specific piece of property from the claims of himself* and the creditors for whom he was a trustee. *Scholey v. Worcester*, 6 Thomp. & C. (N. Y. Supreme Ct.) 574.

In view of the charge of fraudulent conspiracy, this letter of Mr. Hargadine's is a most significant fact in this case. Mr. Hargadine testifies that *when he wrote that letter he understood that William L. Cohen was helping his brother* and this letter, read in the light of this declaration and fairly construed, means that these creditors propose to give William another opportunity of helping his brother. They understood, and the record abundantly establishes the fact, that William

Cohen was a wealthy man and could aid his brother, and they recognized that he had the right to assist him. What, then, is their proposition? We "are very desirous of having the matter closed up in some way that they may realize something from it, and have determined that, unless some other arrangement can be made, they will pay off whatever lien Judge Schulte may have on the property and take possession and dispose of it." Now, certainly they had the unquestioned right to do this. Neither William or Philip Cohen was in the way. They were not asserting any title. It was not necessary to consult either of them. It could have been sold without their knowledge. But what follows, "*Prior to taking this action they make this proposition: if you or your brother will pay them fifteen hundred dollars, Mr. Hargadine will make a quitclaim deed conveying the property to whoever you may name.*"

Now this proposition is made to either William or Philip. The offer is to "*you or your brother,*" and the deed is to be made to whomsoever the purchaser may select, be it *William or Philip.* Can it be argued for a moment that if William Cohen paid his own money for this lot and took the deed to himself it was still to remain a security for the unpaid balance of Philip's debts to Mr. Hargadine? Such a proposition would be so clearly inequitable that we opine no lawer would seriously assert it. It would be equivalent to asserting that a mortgagee might foreclose his mortgage on the whole mortgaged premises for the first installment and resell the same property in the hands of the purchaser for a subsequently accruing payment, a proposition repudiated by this court as early as 1842 in *Buford v. Smith*, 7 Mo. 489, and frequently repeated since that time. *Mitchell v. Ladew*, 36 Mo. 526.

This proposition meant simply that the friendly creditors were willing to release all their rights in this

land for $1,500, and they were willing that even their debtor, Philip Cohen, might have the benefit of this property discharged of their claims. The other construction, and that put upon it by plaintiffs, is that plaintiffs could thus induce Philip Cohen to raise them $1,500 for a quitclaim and as soon as that amount was pocketed they could at once repudiate the transaction and resell it and repurchase it, because Philip has thus been induced to put his money in it.

It must be kept in mind that the question here is not one between Philip and any other creditor, but it is one between the owners of this property who are at the same time judgment creditors and a brother of the judgment debtor. Can it be supposed for a moment that when Mr. Hargadine was reminding William Cohen that Schulte's mortgage alone stood in the way, that he was secretly meditating the enforcement of the unpaid balance of his judgment against Philip as soon as that mortgage was satisfied? We think such a contention would be a reflection upon the memory of a man who occupied such a commanding position in the great city of St. Louis. We prefer to think and hold that it was an offer in equity to release any and all liens and claims to this lot for $1,500, and if Philip himself could raise the money this particular property might be conveyed to his brother discharged of all claims by these creditors.

The principal evidence tending to establish fraud in the case was the relationship existing after William had purchased the stock of goods. It is asserted that he took too many precautions to secure himself; but, when it is considered that plaintiffs' own attorneys had drawn the bill of sale by which Mrs. Cohen obtained the goods, and that, notwithstanding that, the goods had all been seized and he had been compelled to purchase the unfriendly judgments to save what he had

already loaned her and that he took the bill of sale from Philip and his wife and caused the goods to be sold under the advice of Mr. Cahoon, we do not think that suggestion comes with good grace. That William Cohen had already at that time let Mrs. Emma Cohen have $4,000 to stock the store, we think the record fairly shows; that he put in $1,600 additional cash at St. Louis is beyond all cavil. Having bought the goods with his own money he had a right to embark in the mercantile business in Fredericktown. He at once placed his own name over the establishment.

Again it is argued that it is suspicious that he gave his brother too much latitude in managing the business; but, if we are right in finding that he owned the store, we can not see how it injured any creditor, even if he gave Philip more than his services were worth. The lot of a debtor will be hard indeed, if it ever comes to pass that, if, after all his goods are sequestered by his friendly creditors, to say nothing of the unfriendly, not even his brother is allowed to employ him, and afford him a means to support his wife and children. If there was any substantial evidence that Philip had property of any considerable value covered up, or that William had none, a very different case would be presented. From the evidence, it seems that Philip had added to the stock and made the business prosperous since it began in William's name. The evidence is that William being a stock trader and farmer came over four or five times a year and visited the store and examined into its condition with Philip, as he was compelled to rely largely upon Philip, which he testifies he did, because he had never wronged him.

But the discussion as to the stock of goods is only incidental to the transfer of the storehouse. That it was entirely competent for William Cohen to buy this lot and place his deed of record, and even permit his

brother to occupy it, rent free, if he saw fit, no one will deny. *Gutzweiler v. Lackman*, 28 Mo. 434. His title to this property is all that is in question in this suit. He could have purchased it and created a spendthrift trust in it for his brother and family had he so desired, and it could never have been reached by Philip's creditors. *A fortiori* could he buy it, under the inducement held out by Mr. Hargadine, and hold it against the charge of fraud in the petition.

As this transaction is attacked *because fraudulent under our statute of fraudulent conveyances*, we have not deemed it necessary to enter at length into the discussion of any actual fraud upon Mr. Hargadine whereby he was overreached in the trade. He very candidly says he got what he considered it reasonably worth, and, any way, there is absolutely no reason for disturbing the trade on any such ground. There was no misrepresentation either as to value, situation, or incumbrances, and the facts were well known to Mr. Hargadine. The sole excuse for setting aside the deed is that the consideration was paid by Philip, and as Mr. Hargadine agreed that Philip might furnish the consideration and he would make a deed to William, he and those for whom he is trustee are absolutely estopped *by his deed* from saying the transaction was fraudulent. *Quinlan v. Keiser*, 66 Mo. 603. The judgment is reversed with directions to the circuit court to dismiss the bill. Judges SHERWOOD and BURGESS concur in reversing the judgment, but express their views in their own way in opinions herewith filed.

BURGESS, J., (*concurring*).—While Hargadine would doubtless be estopped from setting aside the deed from him to W. A. Cohen, upon the ground that it was fraudulent as to the creditors of Philip Cohen for the reason that he was a party thereto, no such question is raised

by the proceedings in this case. Not one word is said about estoppel, either in the answer of defendants, or by their counsel in their briefs. It has been uniformly held by this court that estoppel *in pais,* when relied upon as a defense, must be pleaded. *Avery v. Railroad,* 113 Mo. 561; *Bray v. Marshall,* 75 Mo. 327; *Noble v. Blount,* 77 Mo. 235; *Messersmith v. Messersmith,* 22 Mo. 372.

The issues were made upon the theory that, even if the deed referred to had been obtained by fraud from Hargadine by the defendants Cohen, before Hargadine should be permitted to have the same set aside, he should refund to William Cohen the amount of the purchase money received for the property described in that deed, and, as he did not offer to do this, that under no circumstances was he entitled to have the deed set aside, for the reason that "he who seeks equity must first do equity," and that it would be inequitable to permit Hargadine to retain the purchase money received by him for a deed to the property and at the same time ask that the deed be set aside because fraudulent as against plaintiffs as creditors. To this I agree and think the judgment ought to be reversed because no such offer was made in the petition or otherwise.

Counsel for defendants, in their brief, concede that, because of the fact that a creditor has once bought the land of his debtor at sheriff's sale, and resold it to him, the creditor does not, by reason thereof, exempt the property from further liability for any balance of the judgment remaining unpaid. With reference to this question they say: "Any creditor who received part of the purchase money or all of it, that came from W. L. Cohen, that might have been furnished or was afterward paid to W. L. Cohen by Philip Cohen, might have had such property sold on execution to satisfy the balance of his judgment, and he might at such sale

have become the purchaser thereof, and afterward proceeded to have the deed to W. L. Cohen canceled, not because fraudulent as to creditors, but because a cloud upon his title. But this is not the case we are considering. The effort here is to cancel a deed because fraudulent as to creditors, and which was fraudulent in its procurement.''

Upon this question, however, I express no opinion.

Nor do I upon the question passed upon by my associate, GANTT, J., in which he holds that the property in controversy, after having once been sold at sheriff's sale under judgment in favor of Hargadine, was thereby released from, and could not be again sold for, any balance remaining due upon said judgment, because no such question was raised either in the pleadings or by counsel upon either side, and I prefer to withhold my opinion upon that point until such question is properly presented for the consideration of this court.

SHERWOOD, J., (*concurring*).—I have no doubt of the correctness of the position taken by GANTT, P. J., that Hargadine should be estopped from asserting title to the land after the making of the agreement and deed and payment of the consideration as suggested by himself. Unless this is what *he meant*, the transaction between William Cohen and himself was an idle form and a useless ceremony.

And I hold, further, that, even if Philip Cohen furnished the funds for the purchase of the property and the obtaining of the deed from Hargadine, that fact would not change the result; for Hargadine could not gainsay it. But, notwithstanding this, the only way to take advantage of this *dormant* estoppel is *to plead it*, as estoppels *in pais* are valueless, unless pleaded, as shown by BURGESS, J.

Thompson v. Cohen.

In consequence of the failure to plead the estoppel, the case stands here without the protection afforded by the latent, unpleaded and undeveloped estoppel.

These remarks, however, would not apply to what is known as the *"outside creditors;"* for they have not "tied a knot with their tongues that they could not untie with their teeth," as has Hargadine.

As it is agreed by my associates that the judgment must be reversed and the cause remanded, ample opportunity will be afforded the contestants to fairly develop all the issues in the cause before it returns again to this court.

ON MOTION FOR REHEARING.

PER CURIAM.—Upon a motion for rehearing, we have reconsidered the grounds of our former opinions, and see no reason for changing our conclusions, that, on the pleadings and evidence as they now stand, plaintiff can not recover. We are all agreed that the judment should be reversed, Judge BURGESS on the ground that, prior to, or at the time of, the commencement of the action, Mr. Hargadine made no offer to refund the money he had received for his deed which he sought to set aside as fraudulent, and Judges SHERWOOD and GANTT, in addition to this ground, for the further reason that Mr. Hargadine and those creditors for whom he was trustee were estopped by their own conduct from assailing the deed made by Mr. Hargadine as fraudulent, whether a tender was made or not. For these reasons, it is apparent no good purpose would be subserved by remanding the cause, and it is accordingly simply reversed.