## PURSE, Administrator, Appellant, v. ESTES.

### Division One, November 19, 1901,

1. **Fraudulent Conveyance**: EFFECT OF VALID SUBSEQUENT EXECUTION SALE. It is immaterial whether a deed be fraudulent as to the grantor's creditors, if at a subsequent sheriff's sale under a judgment against the grantor, his grantee in such conveyance becomes the purchaser and receives a valid sheriff's deed for the lands, the sheriff's sale having been made at the instance of the judgment creditor who seeks to have the conveyance declared fraudulent. After the sheriff's sale was made and he received the proceeds thereof, he should not be heard to say, if the lands had sold for as much as they were then worth, they would have paid his judgment, nor should he be heard to otherwise question the validity of the title that he thus materially assisted in passing to the grantee in the conveyance which he alleges to be fraudulent.

2. ———: GRANTOR'S PAYMENT OF PRIOR INCUMBRANCES: RESULTING BENEFIT. Where the grantee in a conveyance buys the property at a sheriff's sale under a judgment against the grantor, and subsequently the grantor pays certain mortgages on the land prior to the sheriff's deed, and the judgment creditor again has execution and this time the lands are sold to a third party, and the interest of this party is subsequently acquired by the grantee in the first sheriff's deed by his paying to the grantee in the second the amount of the mortgages paid by the judgment debtor, the grantee in the last sheriff's deed stands in the shoe of the judgment creditor at whose instance the sales were made, and, hence, that judgment creditor is in no position to complain that the purchaser at the last sale transferred the title thus acquired to the grantee in the first sheriff's deed, especially if that transfer is made in conformity to a decree of court.

Appeal from Pike Circuit Court.—*Hon. R. F. Roy,* Judge.

AFFIRMED.

Vol 165 mo—4

*D. A. Ball* and *I. C. Dempsey* for appellant.

(1)   This suit being prosecuted by a creditor, the statute of frauds has no application.   Shaw v. Shaw, 86 Mo. 594; Ryland v. Callison, 54 Mo. 513; Bobb v. Woodward, 50 Mo. 100; Herrington v. Herrington, 27 Mo. 560; Rogers v. Rogers, 87 Mo. 257.   (2)   A part of the money to purchase the lands in controversy was furnished by Lemuel M. Wells, and the entire transaction is therefore void.   State ex rel. v. Hope, 102 Mo. 410; Seger v. Thomas, 107 Mo. 635; National Tube Works Co. v. Ring Refrigerating and Ice Machine Co., 118 Mo. 365; Boland v. Ross, 120 Mo. 208; Barton v. Sitlington, 128 Mo. 164.   And the fact that lands were bought at execution and trustee's sales, the fraud of procuring a decree, and the pretended purchase at execution and trustee's sales, do not aid the matter.   Dallam v. Renshaw, 26 Mo. 533; Woodward v. Mastin, 106 Mo. 324; Gutzwiller v. Lackman, 23 Mo. 168; Benne v. Schnecko, 100 Mo. 257; Johnson v. Sullivan, 23 Mo. 474; Sexton v. Anderson, 95 Mo. 373; Hampton v. McClanahan, 143 Mo. 501.   (3)   The decree in Hostetter v. Estes was concocted in fraud and is subject to collateral attack. McClanahan v. West, 100 Mo. 320.

*W. M. Williams* and *Pearson & Pearson* for respondent.

(1)   Plaintiff has no standing to maintain this suit, in the absence of proof on his part, that the deeds through which Estes obtained title to the land in controversy were executed by collusion between L. M. Wells and Estes, for the purpose of hindering, delaying or defrauding the creditors of said L. M. Wells, deceased.   Estes' title to the land does not depend upon his deeds to the "Coles tract," made by Wells on the seventeenth day of May, 1887.   Assuming that, notwithstanding said deed, said L. M. Wells still had an equity of redemption in the land, J. G. Reeds, the predecessor of

plaintiff, as administrator of the estate of C. C. Wells, deceased, caused that equity of redemption to be levied upon under an execution issued upon the very judgment upon which plaintiff now relies; and had said land sold. Estes became the purchaser at that sale for fifty-three hundred dollars. He paid the purchase money. There is not one particle of evidence in the record that one single cent of this money was furnished by L. M. Wells. The estate of C. C. Wells received this money, paid to it by Estes, for all the right, title and interest of L. M. Wells in and to all of the lands in controversy. Plaintiff certainly can not be heard to say that this sale, controlled by his predecessor, was made to defraud creditors. Neither can he be allowed to impeach the same, while retaining the proceeds thereof. Thompson v. Cohen, 127 Mo. 215; Austin v. Lowring, 63 Mo. 19. Plaintiff must not only avoid the sale made under the execution, in favor of J. G. Reeds, administrator of the estate of C. C. Wells, deceased, against L. M. Wells, on the thirteenth of September, 1888; but he is confronted by a second sale, made under the same judgment, in March, 1889. J. D. Hostetter purchased at this sale. Hostetter was not connected with Estes and did not make the purchase for him. He did not buy for the purpose of hindering, delaying or defrauding the creditors of L. M. Wells. The record contains no pretense of any collusion on his part with L. M. Wells for the purpose of defrauding the creditors of the latter. Estes compromised the matter with them, and acquired, by the decree entered in the case, all the title conveyed to Hostetter by the sheriff's sale in March, 1889. This is a complete answer to plaintiff's action. After having made the sale, and thereby induced Hostetter to purchase, plaintiff is estopped from questioning the bona fides thereof. Estes acquired all of Hostetter's title by the decree entered in the suit instituted against him by Hostetter. The right to contest the validity of any prior conveyances of Wells' interest passed to Hostetter by the sheriff's sale. The plaintiff in the judg-

ment had no such right thereafter. Knoop v. Kelsey, 121 Mo. 642; Huffman v. Nixon, 152 Mo. 303; Gentry v. Robinson, 55 Mo. 260. (2) In attempting to set aside a deed of a purchaser, at a judicial sale, or at a sale by a trustee, the burden of showing fraud is upon the party attacking the sale and deed, and to justify a cancellation of the deed, the evidence adduced to establish the fraud must be clear and convincing. Keiser v. Gammon, 95 Mo. 224; Forrester v. Sconnville, 51 Mo. 268; Jackson v. Wood, 88 Mo. 77; McNew v. Booth, 42 Mo. 189; Kennedy v. Kennedy, 57 Mo. 76; Forrester v. Moore, 77 Mo. 651; Thompson v. Cohen, 127 Mo. 215. (3) If the petition states a cause of action, there is no probative evidence to substantiate the allegations therein contained, to-wit: (a) That there was an agreement that Estes should buy up all the claims against L. M. Wells, and all the lands sold under or by reason of any outstanding claims, of any description, and hold the same in trust for Wells. (b) That Wells furnished all the money used by Estes in buying up the property described in plaintiff's petition. We challenge an examination of the record to find any evidence establishing a resulting trust. It was attempted by plaintiff to show such by parol evidence. Such evidence must be conclusive in its character. Shaw v. Shaw, 86 Mo. 598; Rogers v. Rogers, 87 Mo. 259; Burdett v. May, 100 Mo. 16.

VALLIANT, J.—This is a suit in equity by a judgment creditor who seeks to have subjected to the payment of his debt, lands alleged to have been fraudulently conveyed by the judgment debtor to the defendant Estes, and the rents and profits arising out of those lands. The petition shows that the judgment debtor is dead and administration is pending on his estate, but the administrator is not a party and the record here also shows that since the judgment in the circuit court the defendant has died and the cause has revived against the administrator of his estate, but his heirs are not brought in.

The case made by the petition is substantially this: Plaintiff's predecessor in the administration of the estate of Charles C. Wells obtained a judgment in April, 1888, for $31,395 against Lemuel M. Wells. While the suit in which that judgment was rendered was pending, L. M. Wells owned a tract called the Coles land, containing over 3,000 acres, of which about 2,300 lay in Pike, and the rest in Lincoln county. Wells also owned a large quantity of other lands in Pike county, which are known in this record as the Ashley lands. In May, 1887, while plaintiff's suit was pending, Wells conveyed to defendant Estes, by deed of general warranty, all of the Coles land. At that time the Coles tract, so the petition says, was worth $80,000, and that part lying in Pike county, $65,000. When the conveyance was made, a written agreement was also made by which Wells was given three years in which to redeem the lands from incumbrances held by Estes, which agreement was kept secret and the whole transaction was contrived between them to defraud the creditors of Wells. Notwithstanding the conveyance, Wells remained in possession for a time, but Estes afterwards took possession and collected rents and received profits amounting, according to the petition, to $40,000. The Ashley lands were covered by mortgages, and the allegation is that as to these a secret agreement was made between Estes and Wells that the former should buy up the mortgages, foreclose the same, and take titles to himself, collect rents, etc., and after reimbursing himself for his outlays, pay to Wells the balance of proceeds of sales, rents, etc. Wells was to furnish what money he could to the scheme, and this agreement was to cover all titles that might be acquired by Estes to any of these lands, by deed, decree or otherwise. In September, 1888, execution issued on plaintiff's judgment, under which the interest of Wells in all these lands in Pike county were sold, Estes becoming the purchaser, and again in March, 1890, an alias execution on the same judgment issued, under which the lands were again sold, and one Hos-

tetter became the purchaser at that sale. Subsequently, in a suit by Hostetter against Estes, a decree was entered under which the title of Hostetter passed to Estes, and afterwards, Estes caused all the deeds of trust on the Ashley lands to be foreclosed and bought in by himself; he took possession and has since, by the plaintiff's estimate, collected $20,000 in rents from the same. It is further alleged that for use in the transactions Wells furnished Estes large sums of money, how much plaintiff is unable to say. Wells died in 1892, leaving a will which has been probated and one Lewis Holliday has qualified as executor and is now in charge of the estate. Plaintiff's judgment has been presented to the probate court and placed in the fourth class. The estate is insolvent. The prayer of the petition is that Estes be called to account for the rents that he has received of these lands since his purchase at the sheriff's sale, and that plaintiff be paid in full out of the money so brought in, giving preference to plaintiff's debt over any, if any, that may be found due to defendant, and that these lands be sold, and after paying plaintiff and costs the rest to be paid into court to be disposed of by the court as it may see fit. The answer was elaborate, joining issue on the allegations of fraud, secret agreement, etc., denying that Wells furnished Estes any money to buy titles or incumbrances.

The evidence shows that at the date of the deed from Wells and wife to Estes, in May, 1887, the latter held deeds of trust on the Coles land bearing ten per cent compound interest amounting to $48,880.03, and the payment of the debt was the consideration of the deed. There was a written agreement made at the same time by the terms of which Estes was to reconvey the land to Wells at any time within three years upon his payment of the above-mentioned sum with interest at six per cent per annum, Estes to have the right to sell the land or any part of it, but if he did so and if Wells wanted to redeem, the amounts received by Estes from such sale or

sales, together with the rents that might have been collected by him in the meantime, should be deducted from the $48,880 and interest. This agreement was not put on record, and there was evidence tending to show that the parties designed to keep it secret, but the evidence was not all one way on that point, and in fact the agreement was not kept secret very long if it all.

At the sheriff's sale in September, 1888, Estes became the purchaser of all the land in Pike county for $5,502.50, which he paid and which went towards the satisfaction of plaintiff's debt. At the subsequent sale of the same land under execution on the same judgment, it was knocked off to Hostetter for $75. There was also a sale under execution of the land in Lincoln county, and Charles Martin became the purchaser. After Hostetter made his purchase he brought suit against Estes to set aside the latter's title; this suit resulted in a decree by which the title acquired by Estes at the first sheriff's sale was declared valid, but there was a finding that after that sale, Wells without the knowledge of Estes, paid sums aggregating $3,036.50 on valid incumbrances on the Ashley lands to which Estes' sheriff's title was subject; it was held that Wells thereby acquired an equitable interest to that extent in the land and that Hostetter had bought that interest at the second sheriff's sale, and it was decreed that Estes should pay Hostetter that sum of money with interest, that upon such payment Hostetter's title should pass to Estes and that was accordingly done.

It was shown that in November, 1888, which was after the purchase by Estes at the sheriff's sale, Wells paid Estes $2,000, which sum the latter afterwards returned to Wells. The testimony of both Wells and Estes on this item was vague, but the conclusion it leaves is that at that time they both regarded the agreement by which Wells had a right to redeem as still in force, and the money was paid on that account, but returned when they regarded the right at an end or abandoned.

It was also shown, as was found in the Hostetter decree, that after the sheriff's sale Wells made payments to some holders of the notes secured by deeds of trust on the Ashley lands. The various estimates of witnesses showed the Coles land to be worth from $65,000 to $80,000, and the Ashley lands about $20,000.

There was evidence that during the last illness of Wells, and a few days before his death, he said to Estes that the agreement between them was that after he (Estes) got his money out of the Ashley land the balance was to be turned over to him. Estes said that he did not so understand it, but that he did not want Wells to die feeling unfriendly to him and that he would yield to his understanding of the matter and let it be as Wells said. There is quite a voluminous record in the case, but the foregoing is substantially what is made out by the pleadings and evidence. The finding and decree in the circuit court were for the defendant, and plaintiff is the appellant here.

The transactions out of which this suit arises have been before this court twice before. [Martin v. Estes, 132 Mo. 402; Martin v. Turnbaugh, 54 S. W. 515, 153 Mo. 172.] The parties are not the same, that is, the plaintiff here was not a party in either of those suits, and the facts are not altogether alike, but sufficiently so to mark out a line of reasoning for us now very similar to those along which the conclusions in the former cases were reached.

In the first of those cases, Martin, the purchaser of the Lincoln county land at sheriff's sale, was plaintiff and Estes defendant, and in that suit it was decided that the deed from Wells to Estes of May, 1887, was fraudulent and void as to the creditors of Wells, but that the mortgage debt of Estes was not affected thereby. In the second case, which was an action of ejectment by Martin against Estes for the possession of the land, Estes by way of equitable defense set up his deed of trust debt and the court held that he was entitled, subject to the

counter defense set up in the reply, to satisfaction for a part of his debt out of the Lincoln county land in the proportion of their value to the whole property covered by the deeds of trust. In that case this court, per MARSHALL, J., said: "When the fraudulent deed from Wells to Estes was annulled, it did not operate on or affect the deeds of trust, and, but for the release thereof by Estes, they would have remained as valid, subsisting liens upon the land; and when the release was cancelled and the deeds of trust thereby reinstated by the court in this case, the *status quo* of the parties prior to the execution of the fraudulent deed was restored, and thus the parties to that fraud were punished as far as a civil court could punish them, and the honest rights of the parties, respectively, were subserved and enforced. When Estes purchased the Pike county part of the land at the sheriff's sale under execution in favor of C. C. Wells's administrator against Lemuel M. Wells, he united at once in himself the lesser, qualified title embraced in the deeds of trust, with the equity of redemption which the sheriff sold and thereby acquired the absolute title to that part of the lands, and the deeds of trust were at once merged into the absolute title as to the Pike county land." Now, whilst the plaintiff here is not bound, as by an adjudication, by what was said there, because he was not a party to that suit, yet the logic of that conclusion is as applicable to the facts of this case as to that.

Under the facts of the case at bar, so far as plaintiff's rights are concerned, it is immaterial whether the deed from Wells to Estes of May, 1887, be void or not, and it is immaterial what was the value of the lands Estes acquired by the transactions complained of, for, conceding that plaintiff's opinion of the deed is correct, and that his estimate of the value of the land is just, still those matters cease to influence the case after the sheriff's sales.

There was nothing in the records in the other suits referred to above, and there is nothing in this, to impeach the

validity and honesty of the deeds of trust held by Estes on the Coles land. In May, 1887, the debts due Estes, secured by those deeds of trust, amounted to $48,880, and they were bearing ten per cent compound interest. Plaintiff, or rather his predecessor, conceiving that the Wells-Estes deed was fraudulent and void, levied his execution, as he had a right to do, on the equity of redemption of his judgment debtor in all those lands and caused them to be sold. The plaintiff in execution had absolute control of that sale. If he had then thought that the lands were worth so much more than the mortgage debts, as he now thinks, he could have bid the amount of his judgment, which was over $30,000, and have bought in the land, or, if he did not care to buy the land, he could, when he saw them going for an inadequate price, have called off the sale. But with all this advantage he stood by and suffered the sale to go on, suffered the land to be knocked down to Estes for something over $5,000, which Estes paid to the sheriff and the sheriff paid to the plaintiff or his representatives; and that money the plaintiff still has. Shall he now be heard to question the validity of the title that he himself so materially assisted in passing to. Estes? Shall he keep the $5,000 and have the land back also? [Austin v. Lowring, 63 Mo. 19; Thompson v. Cohen, 127 Mo. 215.] Even if the sheriff's deed could be set aside at plaintiff's suit, Estes' deeds of trust would, by the same fact, be restored, and before plaintiff could reach the land he would have to settle with Estes for this debt, interest and all, and that he has not offered in his petition to do.

After that sale, it seems that the plaintiff or his predecessor, seeing that Wells was still taking an interest in the lands by making payments on the mortgage debts, concluded that he still had an interest in them, and therefore caused an alias execution to issue on the same judgment and had the lands again sold. He was again the master of that situation and could have made the land bring enough to satisfy his debt if they were of sufficient value. But he let them be sold to

Hostetter for $75, and he took that money.  Hostetter, armed with that weapon, which the plaintiff had given him, then turned on Estes and by a suit in equity developed the fact that Wells had paid incumbrances on the Ashley lands to which Estes' sheriff's title was subordinate and that suit resulted in a decree requiring Estes to pay Hostetter the amounts so paid by Wells on the theory that Wells by such payments had acquired an equitable interest in the property to that extent.  In the whole transaction Hostetter stood in the plaintiff's shoes, that is, stood in the vantage that plaintiff had placed him.  Plaintiff is in no position to complain of what Hostetter did with the title he furnished him.  [Gentry v. Robinson, 55 Mo. 260; Knoop v. Kelsey, 121 Mo. 642; Huffman v. Nixon, 152 Mo. 303.]  It follows, of course, that if Estes, as against this plaintiff, got a good title to the land at the sheriff's sale, the plaintiff has no right to call him to account for rents.

There is but one possible ground upon which the plaintiff could have reached the land or its rents, for further satisfaction of his judgment after he had sold it as above indicated, and that is on the theory that Estes at the sheriff's sale had secretly purchased for the judgment debtor and with funds furnished by him.  But there is not a particle of evidence to countenance such a theory.  Even the petition does not definitely make such a charge.  There is an allegation in the petition of a secret agreement between Wells and Estes, by which Estes was to buy up incumbrances and titles and after reimbursing himself for his outlay was to turn over to Wells all the profits, and to this end Wells was "to furnish as much money as he could."  If it is by this intended to charge Estes as trustee of an express trust, the agreement should be in writing and there is no contention that there was such; if it is intended to reach a case of resulting trust the averments fall short of the mark, and the proof does not go even as far as the averments.  We do not see how the chancellor, under the evidence, could have reached any other conclusion than he did reach.  Respondent

makes other points in his brief in support of the judgment; but as the case is disposed of in what is above said, it is unnecessary to go farther into it.

The judgment is affirmed.    All concur.